UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERICO CABRALES and TYCHICUS STANSLAS, individually and on behalf of others similarly situated,<br><br>                                   Plaintiff,<br><br>v.<br><br>BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>                                   Defendant. | Case No.:  21-cv-02122-AJB-DDL<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and**<br><br>**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**(Doc. Nos. 113, 126)** |

Presently pending before the Court are Defendant BAE Systems San Diego Ship Repair, LLC's motion for partial summary judgment, (Doc. No. 126), and Plaintiffs Federico Cabrales and Tychicus Stanislas' (collectively, "Plaintiffs") motion to certify class, to appoint Plaintiffs as class representatives, and to appoint Matern Law Group, PC as class counsel, (Doc. No. 113). The motions are fully briefed, (Doc. Nos. 128, 138, 139, & 140), and the matter is suitable for determination on the papers and without oral argument, pursuant to Local Civil Rule 7.1.d.1. Accordingly, the Court hereby **VACATES**

the hearing currently set for __December 11, 2023, at 3:00 p.m.__ For the reasons stated herein, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion for partial summary judgment, and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for class certification.

## I.   BACKGROUND

Plaintiffs Federico Cabrales and Tychicus Stanislas (collectively, "Plaintiffs") bring this putative class action for alleged violations of wage abuse under California Labor Codes; California Business and Professions Code § 17200, *et seq.*; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; and the Private Attorneys General Act ("PAGA") as a representative action, California Labor Code § 2699, *et seq.* (*See generally* Second Amended Complaint ("SAC"), Doc. No. 21.) Plaintiffs assert Defendant engaged in policies and practices of "failing to pay overtime premiums; failing to provide rest and meal periods; failing to properly maintain records; failing to provide accurate itemized statements for each pay period; failing to properly compensate All Plaintiffs for necessary expenditures; and requiring, permitting or suffering the employees to work off the clock" in violation of California law. (*Id.* ¶ 14.)

Defendant points out, and Plaintiffs do not dispute, that although Plaintiffs were employed at the BAE San Diego Ship Repair shipyard, located at 2205 E. Belt Street in San Diego, California ("Shipyard"), during the relevant class period, BAE employees in the putative class also worked at Naval Air Station North Island, also known as Navy Base Coronado ("North Island"), and Naval Base San Diego, known as 32nd Street and formerly known as the Destroyer Base ("32nd Street"). (Doc. No. 128 at 16–17.) The parties differ as to what effect, if any, this range of work locations has on class certification questions.

Plaintiff Cabrales filed the original complaint on October 26, 2021, in the Superior Court of California, County of San Diego, as Case No. 37-2021-00045673-CU-OE-CTL. (*See* Doc. No. 1-2.) On December 23, 2021, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1442(a)(1). (*Id.*) On March 7, 2022, the Court granted in part and denied in part Defendant's motion to dismiss Plaintiffs' First Amended

1    Complaint, (Doc. No. 20), and on August 12, 2022, Plaintiffs filed the operative SAC,
2    (Doc. No. 21). On January 4, 2023, the Court granted the parties' joint motion to dismiss
3    Named Plaintiff Steve Whidbee, (Doc. No. 36), and on June 28, 2023, the Court granted in
4    part Defendant's motion to dismiss Named Plaintiff Tony Fuga with prejudice, (Doc. No.
5    101).

6    **II.   DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

7        **A.   Legal Standard**

8        A court may grant summary judgment when it is demonstrated there exists no
9    genuine dispute as to any material fact, and that the moving party is entitled to judgment
10   as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,
11   157 (1970). The party seeking summary judgment bears the initial burden of informing a
12   court of the basis for its motion and of identifying the portions of the declarations,
13   pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact.
14   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might
15   affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby,*
16   *Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is
17   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*
18   *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

19       Where the moving party will have the burden of proof on an issue at trial, the movant
20   must affirmatively demonstrate that no reasonable trier of fact could find other than for the
21   movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where
22   the nonmoving party will have the burden of proof on an issue at trial, the movant may
23   prevail by presenting evidence that negates an essential element of the nonmoving party's
24   claim or by merely pointing out that there is an absence of evidence to support an essential
25   element of the nonmoving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
26   210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of
27   production, then "the nonmoving party has no obligation to produce anything, even if the
28   nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving

3

party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

### B.   Request for Judicial Notice

Both parties request judicial notice in support of their respective briefs. The Court may take judicial notice of facts that are "not subject to reasonable dispute that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court will address each request in turn.

///

///

4

### 1.   Defendant's Request in Support of its Motion for Partial Summary Judgment

In support of its motion for partial summary judgment, Defendant requests judicial notice of five documents: (1) General Order No. 78, establishing the Destroyer Base on February 23, 1922; (2) California Legislature, Stats. 1919, Ch. 82, giving consent to the United States government to acquire land for public defense; (3) Federal Owned Real Estate under the Control of the Navy Department, issued by the U.S. Bureau of Yards and Docks (1937); (4) Political Code (1872), Section 34; and (5) Roger W. Haines, Jr., Federal Enclave Law, 241 (Atlas Books, 1st ed. 2011). (Doc. No. 136-31 at 1–5.) Plaintiffs do not oppose this request. (*See generally* Doc. No. 139.)

The Court finds these exhibits are matters of public record to which there are no reasonable disputes. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). As such, the Court **GRANTS** Defendant's request for judicial notice.

### 2.   Plaintiffs' Request in Support of its Response in Opposition to Defendant's Motion for Partial Summary Judgment

Plaintiffs request judicial notice of six documents: (1) NavBase San Diego, History, website; (2) Statutes of California, Twenty-Ninth Session of the Legislature, Chapter 146, approved March 31, 1891; (3) Statutes of California, Thirty-Third Session of the Legislature, Chapter 114, approved March 20, 1899; (4) Statutes of California, Thirty-Ninth Session of the Legislature, Chapter 258, approved March 22, 1911; (5) Statutes of California, Thirty-Ninth Session of the Legislature, Chapter 663, approved May 1, 1911; and (6) Statutes of California, Fortieth Session of the Legislature, Chapter 324, approved May 26, 1913.

The Court may take judicial notice of a government's website. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010). Moreover, the remaining requests for judicial notice are former California statutes, which are matters of public record. As such, the Court **GRANTS** Plaintiffs' request for judicial notice.

///

**C.      Discussion**

Defendant moves for partial summary judgment, arguing Plaintiffs' state law claims are barred to the extent Plaintiffs and putative class members worked on federal enclaves, that Plaintiffs have no standing to bring their FLSA claim, and that there is no evidence of any company-wide policy or practice to deny meal and rest periods, deny pay for all time worked, or deny reimbursement for necessary business expenses. (Doc. No. 126-1 at 7.)

As an initial matter, Defendant asserts summary judgment must also issue as to Plaintiffs' class-wide Labor Code claims because individualized issues predominate and for failure to establish any injury from a class-wide policy or practice. (*Id.* at 19, 21.) However, these arguments are better suited for a motion for class certification. As such, the Court addresses these arguments in context of Plaintiffs' class certification motion below.

**1.      Timing**

Plaintiffs argue that deciding Defendant's motion before deciding class certification would be improper because the parties agreed to defer merits discovery until after the Court ruled on the class certification motion. (Doc. No. 139 at 17.) Specifically, Plaintiffs claim Defendant refused to produce discovery on the issues it now moves for summary judgment because the parties agreed to phase discovery. (*Id.*) Defendant replies that merits discovery overlaps with class certification issues, and that class certification discovery in this case "revealed that certain issues could not be resolved for the class in a single stroke." (Doc. No. 140 at 3.) Moreover, Defendant asserts it has since produced much of the originally objected-to discovery, including pier utilization charts and charge code data. (*Id.*; Declaration of Taylor Wemmer in Support of Reply, Doc. No. 140-1, ¶¶ 2–3.)

The Court finds Plaintiffs' argument unpersuasive. First, Magistrate Judge David D. Leshner previously stated in the December 2, 2022 Scheduling Order in this case that "[f]act and class discovery *are not bifurcated*; however, all discovery necessary for Plaintiffs' motion for class certification must be completed on or before **May 10, 2023**." (Doc. No. 34 at 2 (first emphasis added).) Moreover, Magistrate Judge Leshner reiterated

this deadline by stating "[t]he **May 10, 2023** deadline *to complete fact discovery* remains in effect . . . ." (Doc. No. 64 at 3) (emphasis added). Finally, Plaintiffs' argument is better suited under a Federal Rule of Civil Procedure 56(d) motion, which was not brought here. As such, the Court finds it may properly decide the instant motion for partial summary judgment.

### 2.    Federal Enclaves Doctrine

Defendant first contends both North Island and 32nd Street are federal enclaves which came into being in 1921 and 1922, respectively, and that no state labor laws were expressly preserved at the time of founding. (Doc. No. 126-1 at 15.) As such, asserts Defendant, Plaintiffs' claims under California's Labor Codes in connection with their work on federal enclaves fail as a matter of law. (*Id.*) Plaintiffs respond that because California's statutory and regulatory framework governing Plaintiffs' claims was established before the two locations were ceded, Defendant's motion must be denied. (Doc. No. 139 at 18.) Plaintiffs further assert Defendant fails to meet its burden of establishing that the federal enclave doctrine applies here because Defendant did not introduce grant deeds and other specific evidence to demonstrate the terms of the state's conveyance. (*Id.* at 22.) However, Plaintiffs fail to cite any caselaw, and the Court finds none, that require the introduction of grant deeds to establish a federal enclave. *See, e.g.*, *Lockhart v. MVM, Inc.*, 175 Cal. App. 4th 1452, 1457 (2009) (the respondent requested judicial notice of a copy of a grant deed, but the court did not state it required the deed to establish a federal enclave; the respondent also requested judicial notice of various articles and documentation to support, and the appellant presented no conflicting evidence); *Del Fierro v. Dyncorp Int'l LLC*, No. CV 19-07091DDP (JCx), 2021 WL 4427235, at *3 (C.D. Cal. Sept. 24, 2021) (stating "all of the facts regarding the establishment of an enclave would appear to be matters of public record beyond dispute" but not requiring submission of a grant deed).

Federal courts have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States, including claims pursuant to the federal

enclave doctrine. 28 U.S.C. § 1331. The federal enclave doctrine draws its authority from Article I, section 8, Clause 17 of the U.S. Constitution:

> Congress shall have power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I § 8, cl. 17. Unless repudiated by Congress, the laws applicable to a federal enclave include (i) federal law and (ii) state laws that were in effect at the time of cession and are not inconsistent with federal law. *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1889–90 (2019) (citing *James Stewart & Co. v. Sadrakul*, 309 S. Ct. 94, 100 (1940)); *see Chicago, R.I. & P. Ry. Co. v. McGlinn*, 114 U.S. 542, 547 (1885). Given the federal government's exclusive jurisdiction over federal enclaves, preexisting state law consistent with federal law continues in force as surrogate federal law, unless altered by Congress. *Korndobler v. DNC Parks & Resorts at Sequoia*, No. 1:15-cv-00459 LJO SKO, 2015 WL 3797625, at *3 (E.D. Cal. June 18, 2015).

Pursuant to the federal enclave doctrine, "the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180, (1988). This shield extends to "a federally owned facility performing a federal function . . . even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Id.* at 181.

First, the Court must determine whether the sites in question are federal enclaves, and, if so, when they became enclaves. As discussed above, Defendant contends both North Island and 32nd Street are federal enclaves which came into being in 1921 and 1922, respectively. (Doc. No. 126-1 at 15.) Defendant supports this contention with both federal caselaw discussing these two enclaves and with requests for judicial notice. (*Id.* at 15–16.)

Plaintiffs dispute this, asserting that (1) while areas of 32nd Street were initially acquired in 1922, the federal government acquired additional tracts of land used for ship repair in 1937; and (2) Defendant fails to demonstrate that North Island is under exclusive federal jurisdiction. (Doc. No. 139 at 22–23.)

### a.    32nd Street

In opposition to Defendant's motion for partial summary judgment, Plaintiffs assert Defendant has failed to meet its burden to show the California Labor Code does not apply to 32nd Street because the federal government acquired additional tracts of land in 1937 when it designated areas for ship repair. (Doc. No. 139 at 22–23; Doc. No. 139-22 at 2.) The Court finds Plaintiffs fail to raise a genuine dispute as to a material fact to defeat summary judgment.

First, the federal government established 32nd Street pursuant to General Order No. 78 on February 23, 1922. (Doc. No. 126-32; *see also* Statutes of California, Stats. 1919, ch. 83 § 3, Doc. No. 126-33.) Various courts have further recognized 32nd Street's federal enclave status. For example, in *Carvajal v. Pride Industries, Inc.*, No. 10CV2319-GPC(MDD), 2013 WL 1728273 (S.D. Cal. Apr. 22, 2013), the court stated "[t]he Naval Base San Diego, formerly known as The Destroyer Base, became a federal enclave on February 23, 1922 pursuant to General Order No. 78 of the Navy Department and the State of California authorized the transfer of land." *Id.* at \*5; *see PRIDE Indus. v. VersAbility Res., Inc.*, No. 1:22-CV-1062, 2023 WL 3060802, at \*5 (E.D. Va. Apr. 24, 2023) (noting "Naval Base San Diego became a federal enclave on February 23, 1922"); *Jimenez v. CRC Prop. Mgmt. W. Inc.* ("*CRC Prop. Mgmt.*"), No. 3:19-CV-01547-JAH-MSB, 2021 WL 4312622, at \*4 (S.D. Cal. Sept. 21, 2021) (same).

Although Plaintiffs offer a website which states 32nd Street added two additional tracts of land in 1937, (Doc. No. 139-22 at 2), they fail to provide evidence of where these additional tracts were located, whether Plaintiffs performed their work on these additional tracts, and whether Defendant's alleged violations occurred there. As such, the Court finds 32nd Street is a federal enclave.

9

### b.    North Island

Next, North Island was established as a federal enclave in 1921. (Roger W. Haines, Jr., Federal Enclave Law, 241 (Atlas Books, 1st ed. 2011) (identifying North Island as a federal enclave), Doc. No. 126-36); *Jimenez v. Haxton Masonry, Inc.* ("*Haxton Masonry*"), Case No. 18-cv-07109-SVK, 2020 WL 3035797, at *4 (N.D. Cal. June 5, 2020) ("Navy Base Coronado (established as a federal enclave in 1921)."); *Carvajal*, 2013 WL 1728273, at *3 n.1 ("North Island, where the alleged incident leading o [sic] his termination is a federal enclave."). Because Plaintiffs have not submitted evidence to create a dispute of a material fact, the Court finds North Island is a federal enclave.

### c.    Whether North Island and 32nd Street Are Under Exclusive Federal Jurisdiction

Next, Plaintiffs argue Defendant fails to demonstrate that 32nd Street and North Island are under exclusive federal jurisdiction. (Doc. No. 139 at 23–24.)

A federal enclave is land over which the federal government exercises exclusive jurisdiction, except to the extent the state reserves to itself certain jurisdiction at the time of cession. *Hammer v. Dynamic Aviation Grp., Inc.*, No. CV 08-8174 ODW(CWX), 2009 WL 10675681, at *2 (C.D. Cal. Feb. 26, 2009); *George v. UXB Int'l, Inc.*, No. C-95-20048-JW, 1996 WL 241624, at *3 (N.D. Cal. May 3, 1996); *see also* U.S. Const. art. I, § 8, cl. 17. When a state cedes jurisdiction and Congress accepts that cession, the federal government can obtain either exclusive, concurrent, or partial jurisdiction. *Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976); *United States v. Jones*, 921 F.3d 932, 935 n.2 (10th Cir. 2019); *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1238 (10th Cir. 2012).

However, federal enclave status does not require a grant of exclusive jurisdiction. *CRC Prop. Mgmt.*, 2021 WL 4312622, at *3. Indeed, "a reservation of authority by the state in a grant of jurisdiction does not negate federal enclave status." *Id.* (citing *Paul v. United States*, 371 U.S. 245, 264 (1963)). The main principle of the federal enclave doctrine is that the federal government has exclusive authority over a federal enclave, not that a grant of exclusive jurisdiction is required for a land to obtain federal enclave status.

10

1  *See Paul*, 371 U.S. at 263; *Kennicott v. Sandia Corp.*, 314 F. Supp. 3d 1142, 1164 (D. N.M.
2  2018).

3      Here, *United States v. Coronado Beach Co.*, 255 U.S. 472 (1921), established that
4  North Island was condemned, and Section 34 of the California Political Code further
5  established condemned lands as ceded jurisdiction to the federal government. (Doc. No.
6  126-35.) Moreover, federal caselaw of this Circuit establishes that North Island and 32nd
7  Street became federal enclaves in 1921 and 1922, respectively, and that the federal
8  government has exclusive authority over it. *Haxton Masonry*, 2020 WL 3035797, at *5;
9  *Carvajal*, 2013 WL 1728273, at *5 & n.1; *PRIDE Indus.*, 2023 WL 3060802, at *5; *CRC
10  Prop. Mgmt.*, 2021 WL 4312622, at *4. Further, Plaintiffs fail to offer evidence sufficient
11  to create a dispute of material fact as to the level of federal jurisdiction as to these two
12  federal enclaves. Unlike in *Lake v. Ohana Military Communities, LLC*, 14 F.4th 993 (9th
13  Cir. 2021), as relied upon by Plaintiffs, there is no showing that Congress has expressly
14  allowed concurrent state legislative jurisdiction as to either North Island or 32nd Street. *Id.*
15  at 1002–03. As such, the Court finds North Island and 32nd Street are subject to the federal
16  enclave doctrine, and federal law governs Plaintiffs' claims as to these enclaves.

17          **d.      Application of Federal Enclave Doctrine to Plaintiffs' State**
18          **Law Claims**

19      Now that the Court has determined North Island and 32nd Street are federal
20  enclaves, the discussion turns to whether Plaintiffs' state law claims as to those locations
21  are barred by the federal enclave doctrine. Plaintiffs' SAC alleges the following violations
22  of the California Labor Code section 201 *et seq.*: (1) failure to provide meal periods,
23  (2) failure to provide rest periods, (3) failure to pay overtime, (4) failure to pay minimum
24  wages, (5) failure to pay all wages due to discharged and quitting employees, (6) failure to
25  furnish accurate itemized wage statements, and (7) failure to indemnify employees for
26  necessary expenditures incurred in discharge of duties. Plaintiffs also allege state law
27  violations of unfair and unlawful business practices under California Business and
28  Professions Code section 17200 *et seq.*, and request recovery for their claims under PAGA,

Cal. Lab. Code § 2698 *et seq*. Plaintiffs argue their claims are not barred by the federal enclave doctrine because California's statutory and regulatory framework was established before the two locations were ceded. (Doc. No. 139 at 18.)

Three exceptions to exclusive enclave jurisdiction exist. First, state regulatory schemes in existence prior to the date of cession, but which require ongoing regulatory changes, will be preempted if they are inconsistent with federal law. *Paul*, 371 U.S. at 268–69; *Parker Drilling Mgmt. Servs.*, 139 S. Ct. at 1889–90. Second, state law is preempted unless Congress specifically authorized such state regulation over the federal enclave. *Swords to Plowshares v. Kemp*, 423 F. Supp. 2d 1031, 1034 (N.D. Cal. 2005). Finally, state laws subsequently enacted by a state are inapplicable in the federal enclave unless the state legislature reserved the right to do so at the time of cession. *See Paul*, 371 U.S. at 268; *Allison*, 689 F.3d at 1238); *Cooper v. S. Cal. Edison Co.*, 170 Fed. App'x 496, 498 (9th Cir. 2006) (holding claims based on state law recognized after government acquisition are barred by federal enclave doctrine).

Here, the Court finds no exceptions apply to Plaintiffs' claims because (i) the state laws at issue were enacted after the federal government acquired North Island and 32nd Street; (ii) Congress did not authorize state regulation of wage-and-hour issues on North Island and 32nd Street at the time of cession; and (iii) California did not reserve the right to apply state wage-and-hour laws to North Island and 32nd Street at the time of cession. The parties only dispute the validity of the first exception in their respective pleadings, and as such, the Court will solely address this issue.

To note, Plaintiffs state in a footnote that "[a]pplication of the California Labor Code to BAE's contract work on federal enclaves does not conflict with the FLSA." (Doc. No. 139 at 21 n.27.) However, "[a] footnote is the wrong place for substantive arguments on the merits of a motion, particularly where such arguments provide independent bases for dismissing a claim not otherwise addressed in the motion." *Rivera v. Garland*, No. 21-cv-213-MMA (AGS), 2021 WL 1889752, at *5 n.3 (S.D. Cal. May 11, 2021) (quoting *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 n.1

12

(N.D. Cal. 2008)). As such, arguments raised only in footnotes are generally deemed waived. *Riegels v. Comm'r (In re Estate of Saunders)*, 745 F.3d 953, 962 n.8 (9th Cir. 2014); *see also Kamal v. Eden Creamery, LLC*, No. 18-cv-01298-BAS-AGS, 2019 WL 2617041, at *8 n.5 (S.D. Cal. June 26, 2019) ("Much like the Court 'do[es] not expect to find elephants in mouseholes,' the Court does not expect to find dispositive arguments in footnotes.") (quoting *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016)).

As discussed above, the Court considers 1921 and 1922 as the dates of acquisition in its discussion of federal enclave jurisdiction.

First, PAGA is inapplicable to North Island and 32nd Street because the law was enacted in 2004, decades after the federal government's acquisition of these areas in 1921 and 1922. Moreover, Plaintiffs' claims for meal and rest period violations are barred because Labor Code section 226.7 was enacted in 2000 and section 512 was enacted in 1999. *See* Cal. Lab. Code §§ 226.7, 512. Plaintiffs also assert claims for overtime and minimum wage violations, failure to pay wages when due, and failure to reimburse, which were enacted in 1937. *See* Cal. Lab. Code §§ 201–203, 510, 1194, 1197, 2802. Similarly, Labor Code section 226 (pertaining to wage statements) was enacted in 1943, and California Business and Professions Code section 17200 *et seq.* was enacted in 1977. *See* Cal. Lab. Code § 226; Cal. Bus. & Prof. Code § 17200.

As to Plaintiffs' claim for minimum wage violations pursuant to Labor Code sections 1194 and 1197, they rely on *Korndobler*, which held that California has had minimum wage laws since 1913 and that "[v]irtually the same statutory and regulatory remains in place today." 2015 WL 3797625, at *5 (quoting *Martinez v. Combs*, 49 Cal. 4th 35, 55–56 (2010)). However, as noted by Defendant, *Parker Drilling Management Services* implicitly rejected this argument by holding California's minimum wage law, California Labor Code section 1182.12(b), did not apply to an area of exclusive federal jurisdiction because the FLSA already provides for a minimum wage, and thus the state law is inconsistent with federal law. 139 S. Ct. at 1893 (citing 29 U.S.C. § 206(a)(1)); *see CRC Prop. Mgmt.*, 2021 WL 4312622, at *5.

Based on the foregoing, the Court **GRANTS** summary judgment as to Plaintiffs' state law claims to the extent the alleged state law violations occurred on North Island and 32nd Street.

### 3. Plaintiffs' FLSA Claim

Next, Defendant argues summary judgment is appropriate as to Plaintiffs' FLSA claim because the putative FLSA collective members, including Named Plaintiffs, failed to properly commence this action within the FLSA's two-year statutory period since they have not filed consent to suit forms with this Court as required by 29 U.S.C. § 216. (Doc. No. 126-1 at 19.) Defendant further argues the last day to add party plaintiffs in this action was January 6, 2023 pursuant to the Court's Scheduling Order, (Doc. No. 34), and that regardless, Named Plaintiffs Stanislas and Cabrales' two-year window to file a consent to join has closed. (Doc. No. 126-1 at 20.) Plaintiffs respond that because Defendant's "willfulness" is disputed, a three-year statute of limitations applies and so Defendant's motion as to Plaintiffs' FLSA claim must fail. (Doc. No. 139 at 25–28.)

The parties do not dispute that the employment relationship between Cabrales and Defendant ended on July 31, 2021, and that the relationship between Stanislaus and Defendant ended on April 22, 2019. Moreover, Plaintiffs do not dispute that Stanislaus is time-barred in the FLSA claim, or that Cabrales would be time-barred if the two-year FLSA statute applies. Thus, the Court **GRANTS** summary judgment of Plaintiffs' FLSA claim as to Stanislaus.

Plaintiffs filed the instant action in part as a collective action under the FLSA, which authorizes an employee to bring an action on behalf of "themselves and other employees similarly situated" if an employer has failed to pay overtime compensation. 29 U.S.C. § 216(b). The FLSA provides that no party may join a collective action "unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Under the FLSA, a "collective action" is considered to be commenced with respect to any individual claimant "on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent

14

to become a party plaintiff is filed on such date in the court in which the action is brought." *Id.* § 256(a). A cause of action under the FLSA "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *Id.* § 255(a).

When a "collective action" is filed under § 216(b), all plaintiffs, including named plaintiffs, are required to file a consent to suit form with the court in which the action is brought. *Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004); *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1133 (D. Nev. 1999). A "collective action" is not deemed commenced with respect to each individual plaintiff until his or her consent has been filed. *Harkins*, 385 F.3d at 1101; *Bonilla*, 61 F. Supp. 2d at 1133 (citing cases); *see also Rix v. Lockheed Martin Corp.*, No. 09cv02063-CAB (NLS), 2013 WL 12090310, at *1 (S.D. Cal. Apr. 12, 2013) (an FLSA suit does not commence with respect to a collective action until a written consent has been filed).

Plaintiffs added a claim under the FLSA in their First Amended Complaint on January 20, 2022. (Doc. No. 9 at 31.) To date, no plaintiff, including the Named Plaintiffs, has filed a written consent to join this action. Plaintiffs, however, maintain that this is of no consequence because the three-year statute of limitations applies due to Defendant's willful violation of the FLSA. (Doc. No. 139 at 26.) The Court finds that because no consent to suit form has been filed, this action has not been properly commenced. As such, Plaintiffs' FLSA claim is time-barred under FLSA's two-year statutory period, unless Plaintiffs can demonstrate that the FLSA's three-year statutory period applies, i.e., Defendant willfully violated the FLSA.

Plaintiffs assert Defendant's violations of the FLSA were "willful" because it "knew it was not paying employees for all work performed during meal breaks (such as traveling, donning/doffing, security checks, securing equipment); did not pay for time spent undergoing mandatory security checks; rounded employees' time punches even though its

15

policy stated employees must be working while on the clock; and did not use the weighted average method to calculate meal period premiums or the regular rate of pay for overtime and double time." (Doc. No. 139 at 26.) Plaintiffs also argue Defendant was on notice of its obligations under the FLSA by prior lawsuits. (*Id.* at 27.)

For the purposes of § 255(a), "[a] violation is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (simplified). "The three-year statute of limitations may be applied where an employer disregarded the very 'possibility' that it was violating the statute, although a court will not presume that conduct was willful in the absence of evidence." *Id.* (simplified).

Plaintiffs contend Defendant was on notice of its obligations under the FLSA because it litigated one previous lawsuit alleging similar FLSA overtime violations, and another lawsuit alleging similar state law claims. (Doc. No. 139 at 27.) On its own motion, the Court takes judicial notice of the docket in these two cases: *Thompson v. NSC Technologies, LLC*, No. 3:20-CV-00371-JO-MSB, 2023 WL 2756980 (S.D. Cal. March 30, 2023), and *Nunez v. BAE Systems San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018 (S.D. Cal. 2017). In *Thompson*, Defendant agreed to reach settlements to the classes of plaintiffs who alleged they had been denied straight and overtime payments in violation of the FLSA. *See generally Thompson*, 2023 WL 2756980. While the Court notes that FLSA claims were not raised in *Nunez*, *see generally* 292 F. Supp. 3d 1018, Plaintiffs assert similar state law claims for failure to pay straight and overtime wages were settled. (Doc. No. 139 at 27.) Both *Thompson* and *Nunez* were conditionally certified and eventually settled. Regarding *Thompson*, the Court finds this persuasive evidence in support of a finding that Defendant has been on notice since some time in 2020 of the "possibility" that it has been violating the FLSA. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003) (stating that for the three-year statute of limitations to apply, "an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute"). In *Chao v.*

16

*A-One Medical Services, Inc.*, 346 F.3d 908 (9th Cir 2003), the Ninth Circuit found an employer's "former FLSA violations, even if they were different in kind from the instant one and not found to be willful[,]" probative of willfulness. *Id.* at 919. Here, while *Thompson* was settled without adjudicating the willfulness issue, the *Chao* court held such a finding is not necessary. Moreover, unlike in *Chao*, *Thompson* is closely analogous, not "different in kind." *Id.*

Plaintiffs also submit sufficient evidence to raise at least a genuine dispute of material fact that Defendant was on notice of its FLSA obligations and willfully failed to comply with them. *See Flores*, 824 F.3d at 906. According to the evidence Plaintiffs submitted, Cabrales "complained to supervisors that [he] wasn't getting a complete meal period and about that [sic] [he] didn't get a full 30 minute meal break, but nothing was ever done." (Declaration of Federico Cabrales ("Cabrales Decl."), Doc. No. 113-2, ¶ 21.) Cabrales' declaration does not state when he complained or to whom. (*See, e.g.*, *id.*) Defendant does not dispute whether this occurred. (*See generally* Doc. No. 140.) Because the Court is unable to conclude as a matter of law that Defendant's conduct was not "willful" within the meaning of the FLSA, the Court **DENIES** Defendant's motion for summary judgment as to Plaintiffs' FLSA claim.

### D. Conclusion

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion for partial summary judgment. Specifically, the Court **GRANTS** summary judgment of Plaintiffs' state law claims as they apply to 32nd Street and North Island due to the federal enclave doctrine, **GRANTS** summary judgment of Plaintiff Stanislaus' FLSA claim, and **DENIES** summary judgment of Plaintiffs' collective FLSA claim.

## III.  PLAINTIFFS' MOTION TO CERTIFY CLASS

### A. Legal Standard

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33

(2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To depart from this rule, the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating the propriety of class certification. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). This burden requires the plaintiff to provide sufficient facts to satisfy the four requirements of Rule 23(a) and at least one subsection of Rule 23(b) of the Federal Rules of Civil Procedure. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. "If the court finds the action meets the requirements of Rule 23(a), the court then considers whether the class is maintainable under Rule 23(b)." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 451 (S.D. Cal. 2014).

In the instant matter, Plaintiffs seek to certify a class pursuant to Rule 23(b)(3). Under Rule 23(b)(3), Plaintiffs must demonstrate that (1) the questions common to the class predominate over any questions that affect only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3). These requirements are commonly known as predominance and superiority.

When entertaining a class certification motion, the court is obligated to conduct a rigorous analysis of whether the requirements of Rule 23 are satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). While the court must not go on a freewheeling inquiry into the merits of the plaintiff's claims, "[t]he class determination generally involves

18

considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Falcon*, 457 U.S. at 160). Accordingly, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The court must therefore limit its inquiry "to those aspects relevant to making the certification decision on an informed basis." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 499 (S.D. Cal. 2013).

### B.  Request for Judicial Notice

Plaintiffs request the Court to take judicial notice of documents filed in support of their Motion for Class Certification. (Doc. No. 113-25.) Specifically, Plaintiffs ask the Court to take judicial notice of:

(1) 2002 Update of the California Division of Labor Standards Enforcement ("DLSE") Enforcement Policies and Interpretations Manual ("DSLE Manual") § 49.2.5;

(2) DLSE Opinion Letter, dated January 3, 1986; and

(3) DLSE Opinion Letter, dated June 2, 1995.

(*See id.* at 2.)  Because the Court does not rely on these documents in reaching its conclusion below, the Court **DENIES AS MOOT** Plaintiffs' requests for judicial.

### C.  Discussion

Plaintiffs seek to certify the following class:

All current and former non-exempt employees of Defendant in the State of California at any time within the period beginning four (4) years prior to the filing of this action and ending at the time this action is certified (the "Class Period").

(Doc. No. 113-1 at 8 (citing Doc. No. 21 ¶ 10).)  Plaintiffs alternatively move to certify the following subclasses:

1. **Minimum Wage Security Subclass**: all non-exempt employees working at the BAE shipyards located in California from October 26, 2017 through March 30, 2020 who were required to go through a security screening.

19

2. **Overtime Security Subclass**: all non-exempt employees working at the BAE shipyards located in California from October 26, 2017 through March 30, 2020 who were required to go through a security screening and who worked a shift longer than 8 hours in a workday and/or more than 40 hours in a workweek.

3. **Rounding Minimum Wage Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, whose time punches were rounded.

4. **Rounding Overtime Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, whose time punches were rounded and who worked shifts longer than 8 hours in a workday and/or more than 40 hours in a workweek.

5. **Overtime Regular Rate of Pay Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who received overtime pay in the same workweek as additional remuneration, including shift differentials and other forms of non-discretionary pay, other than regular or overtime earnings.

6. **Meal Break Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who worked one or more shifts longer than five hours.

7. **Second Meal Break Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who worked one or more shifts longer than ten hours.

8. **Rest Break Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who worked one or more shifts of 3.5 hours or longer.

9. **Reimbursement Cellphone Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who were not reimbursed for the cost of using their personal cell phones for work-related purposes.

10. **Reimbursement Personal Protective Gear and Tools/Equipment Subclass**: all non-exempt employees working at the BAE shipyards located in California during the Class Period, who were not reimbursed for the cost of purchasing personal protective gear and tools for work-related purposes.

11. **Wage Statement Subclass**: all non-exempt direct hire employees working at the BAE shipyards located in California during the Class Period, who received wage statements from October 26, 2020 through August 31, 2021 that did not include a line item showing total hours worked.

(*Id.* at 2–5.)

///

20

21-cv-02122-AJB-DDL

Plaintiffs also move the Court for an order: (1) certifying the derivative claims for failure to timely pay all wages due to discharged and quitting employees, waiting time penalties, failure to furnish accurate itemized wage statements (due to unpaid overtime, minimum wages, and meal and rest period premiums), and unfair business practices; (2) appointing Plaintiffs as class representatives; and (3) appointing Matern Law Group, PC as class counsel. (Doc. No. 113-1 at 8.)

Defendant's opposition focuses primarily on what it sees as Plaintiffs' inability to prove predominance. (*See* Doc. No. 128 at 14–28.) Defendant further argues that even if predominance were satisfied, Named Plaintiffs Cabrales and Stanislas are ill-suited class representatives, and that Plaintiffs' briefing does not demonstrate manageability. (*Id.* at 28–31.)

### 1.    Rule 23(a) Requirements

The Court will first start with an analysis of whether Plaintiffs have satisfied the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy.[1]

### a.    Numerosity

Under Rule 23(a)(1), a lawsuit may only proceed via a class if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Plaintiffs assert the class is sufficiently numerous because Defendant employed approximately 2,365 non-exempt employees in California during the Class Period. (Doc. No. 113-1 at 18.) Defendant does not contest this element. (*See generally* Doc. No. 128.) Accordingly, the Court finds this requirement has been satisfied. *See Knutson v. Schwan's*

---

[1] The Ninth Circuit does not require courts to apply ascertainability as an independent threshold requirement to class certification, and the parties do not address it in their briefs. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018) ("We held that there is no freestanding requirement above and beyond the requirements specifically articulated in Rule 23." (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 n.4 (9th Cir. 2017) ("[Defendant-Appellant] cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not."))).

*Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *6 (S.D. Cal. Sept. 5, 2013).

### b. Commonality

The commonality factor "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The "claims must depend on a common contention" and that common contention must be "of such a nature that it is capable of classwide resolution . . . ." *Id.* The commonality requirement of Rule 23(a)(2) is construed less rigorously, for example, than the "predominance" requirement of Rule 23(b)(3). *Id.* Indeed, for purposes of Rule 23(a)(2), even a single common question will suffice. *Id.* at 359.

Plaintiffs assert commonality is satisfied because all putative class members—Defendant's non-exempt employees across California—are subject to the same policies and practices and suffered the same injuries. (Doc. No. 113-1 at 18–30.) Specifically, Plaintiffs contend the proposed class suffered the same injury of unpaid minimum wage and overtime, unreimbursed expenses, failure to provide meal and rest breaks, and inaccurate wage statements. (*Id.*) The Court agrees with Plaintiffs, and Defendant does not contest, that issues relating to Defendant's policies and practices are questions of law and fact common to the proposed class members. Accordingly, the Court finds Rule 23(a)(2) satisfied.

### c. Typicality

Typicality is similarly met here. Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403) (internal quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[T]he typicality requirement is 'permissive' and requires only that the representative's

22

claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal citations omitted). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted).

The Court finds, and Defendant does not contest, that Plaintiffs' claims are typical of the class. Plaintiffs allege the class has been injured by uniform conduct—specifically, that each of Defendant's non-exempt employees in California were subjected to the same noncompliant policies and practices regarding meal and rest periods, minimum and overtime wages due, reimbursement of work-related expenses, and wage statements. Accordingly, the Court finds Plaintiffs have satisfied typicality.

### d.    Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test, asking the following questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiffs assert they and their counsel do not have any conflicts with the class, and have thus far "represented their co-workers with a focus and zeal true to the fiduciary obligation they have undertaken . . . ." (Doc. No. 113-1 at 30.) Furthermore, Plaintiffs add they have participated in the litigation by preparing and sitting for their deposition, responding to written discovery, attending an Early Neutral Evaluation conference, and working closely with their attorneys. (*Id.*) In opposition, Defendant contends Named Plaintiffs Stanislas and Cabrales have credibility issues. (Doc. No. 128 at 29.)

First, Defendant asserts Stanislas testified about one felony but lied about the conviction, and then failed to mention a second. (*Id.*) Plaintiffs respond that Stanislas fully disclosed his 2011 conviction and discussed the facts, and that as to the second felony, he

did not believe at the time that it "rose to that level." (Doc. No. 138 at 17.) Plaintiffs further assert that "[a]t his deposition, [Stanislas] tried his best to answer questions and fully disclosed the only prior felony criminal conviction that he could recall." (*Id.* at 17–18; *see also* Declaration of Tychicus Stanislas ("Stanislas Decl."), Doc. No. 138-12, ¶¶ 4, 5.)

"The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (quoting *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 1337684, at *4 (N.D. Ill. Mar. 31, 2010)). However, "[c]redibility problems do not automatically render a proposed class representative inadequate." *Id.* (citation and quotation marks omitted). "If the credibility issues are only general in nature and do not relate directly to material issues in the lawsuit, courts will not find a lead plaintiff inadequate." *Jovel v. Boiron, Inc.*, No. 11-cv-10803, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014).

Here, Stanislas' convictions are from the early 2000s, did not involve fraud or dishonesty, and have no relationship to this case. Moreover, Stanislas attests he did not intentionally withhold information and answered every question truthfully and to the best of his ability. (Stanislas Decl. ¶ 4.) At the time of the deposition, Stanislas states the 2011 "conviction was at the forefront of [his] mind and was the only past felony conviction [he] could recall." (*Id.* ¶ 5.) The Court finds Stanislas' inconsistent statements were general in nature and unrelated to a material issue, and thus finds him an adequate representative. *See Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 473 (N.D. Cal. 2016) (holding that because the named plaintiff "has not misrepresented or lied about his actions, nor does the alleged misconduct touch about any material issue for this case[,]" the named plaintiff satisfied Rule 23(a)(4)'s adequacy requirement).

As to Cabrales, Defendant argues he failed to appear to a deposition and was later sanctioned for the failure, and thus is inadequate to be class representative. (*Id.*) Plaintiffs assert Cabrales' non-appearance on one occasion must be considered in the context of his

24

prior service to the instant case, and that "he missed one day of his deposition due to heavy rains making it unsafe for him to travel via motorcycle." (Doc. No. 138 at 17.) The Court finds this one instance of Cabrales' failure to appear to a deposition, in light of his other contributions to this case, do not establish that he would be an inadequate class representative. Thus, based on the foregoing, the Court finds Plaintiffs have demonstrated the adequacy requirement of Rule 23(a)(4).

### 2. Rule 23(b)(3) Requirements

A class may be certified pursuant to Rule 23(b)(3) if the district court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).

### a. Predominance

"The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Vinole*, 571 F.3d at 944 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). The predominance inquiry also includes consideration of whether "adjudication of common issues will help achieve judicial economy." *Id.* at 945 (quoting *Zinser*, 253 F.3d at 1189) (internal quotation marks omitted).

Plaintiffs assert their theories of liability present common legal and factual questions that predominate over their individual issues. (Doc. No. 113-1 at 18.) In opposition, Defendant offers several distinct bases as to why Plaintiffs cannot satisfy the predominance requirement. (Doc. No. 128 at 14–28.)

### i. Temporary Workers

First, Defendant argues the proposed class includes temporary workers from two companies, NSC and Acro, for which neither Cabrales nor Stanislas worked during the Class Period. (Doc. No. 128 at 14.) Plaintiffs respond that pursuant to Ninth Circuit authority, a direct-hire employee can represent a group of employees which include

25

temporary workers because all that must be established in an employment relationship. (Doc. No. 138 at 6 (citing *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016).) Moreover, Defendant has not articulated how this would make a substantive difference in the prosecution of labor code violations. *See Ruiz Torres*, 835 F.3d at 1141. The Court finds both temporary workers and direct-hire employees allegedly experienced the same labor code violations, including failure to pay minimum wage and overtime.

Defendant further contends it is not a joint employer of temporary workers, as alleged by Plaintiffs, and thus a class involving temporary workers cannot be certified. (Doc. No. 128 at 14.) Plaintiffs reply that joint employment is a matter of common proof, undisputed by Defendant, and that it is improper for the Court to resolve merit issues at this juncture. (Doc. No. 138 at 5.) The Court agrees with Plaintiffs. For the purposes of this motion, the Court need not definitely resolve the merits of the joint employment issue, but rather need only address whether the joint employment issue is suitable for class treatment under Rule 23. *See Overpeck v. FedEx Corp.*, No. 18-cv-07553-PJH, 2022 WL 888441, at *4 (N.D. Cal. Mar. 25, 2022).

Where a joint employment relationship is alleged, courts consider whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). Much of the evidence that will be used to address these factors is common evidence. Plaintiffs will look at the master service agreement in place with NSC Technologies, as well as Defendant's actions to show it carried out employer functions including supervision, providing training, determining meal and rest break timing, disciplinary actions, and termination. (*See* Doc. No. 113-1 at 9.) Moreover, Defendant does not suggest the Court will be required to evaluate the existence of a joint employment relationship for each individual temporary employee. (*See generally* Doc. No. 128.)

26

Consequently, the Court concludes that under Plaintiffs' theory of the case, the determination of whether Defendant was a joint employer will not require extensive individualized inquiries that preclude certification of the Rule 23 classes.

### ii. Establishing Liability on a Class Basis

Next, Defendant asserts that in the absence of facially unlawful policies, Plaintiffs cannot establish liability on a common basis because they have not offered representative proof or bona fide statistical sampling that can reliably be extrapolated to the entire proposed class. (Doc. No. 128 at 15–16.) Defendant further argues that Plaintiffs have *proposed* surveys, but that no such exercises have yet been conducted or findings offered. (*Id.* at 16.) Plaintiffs respond they intend to rely on classwide evidence such as Defendant's Rule 30(b)(6) witness testimony, expert analysis, and documentary evidence to establish classwide policies and practices. (Doc. No. 138 at 7.) Moreover, Plaintiffs assert they will use expert analysis of 100% of the class to demonstrate meal and rest break, rounding, and overtime violations, and thus there are no extrapolation concerns. (*Id.*) To this point, Plaintiffs state that while they presented the analysis of a 20% sample in support of their motion, Defendant recently provided data for the entire class. (*Id.*) Further, they assert that prior to certification, they are only required to provide a plausible method and are not yet required to conduct the proposed study. (*Id.* (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022), and *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 582 (N.D. Cal. 2013)).)

Plaintiffs additionally contend Ms. Steiner, who specializes in employment and wage and hour research, will conduct a survey which can reliably be extrapolated to the class as a whole; that Mr. Grieser, who specializes in time studies, opines a study to determine both prevalence and length of shortened meal and rest breaks can be done; and that this is sufficient for the purposes of class certification. (Doc. No. 138 at 7.)

At the certification stage, Plaintiffs are required to establish their damages model is capable of measuring damages on a class-wide basis and consistent with Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35. Plaintiffs maintain the damages may be determined

by common evidence consisting of statistical analysis of 100% of class member data and two surveys. The Court finds Plaintiffs' damages model measures damages consistent with their theory and can be measured on a class-wide basis.

### iii.    Time Worked on Federal Enclaves

As discussed above in Defendant's motion for partial summary judgment, two locations at which its employees work—North Island and 32nd Street—are federal enclaves which are not subject to California law. *Supra* Section II.D.2. Defendant argues approximately 92% of all non-administrative putative class members spent time working on federal enclaves during the statutory period, and employees often split their shift between time spent on a federal enclave and the Shipyard, which is subject to California law. (Doc. No. 128 at 17–19.) For example, Defendant asserts "Cabrales spent approximately 35% of his shifts while an employee of [Defendant] working at 32nd Street, a federal enclave; 16.14% of his shifts were *split* between an enclave and [the Shipyard] in a single day." (*Id.* at 17 (citing Declaration of J. Michael Dumond ("Dumond Decl."), Doc. No. 128-20, ¶ 12).) Moreover, roughly 22% of the putative class worked exclusively at either North Island or 32nd Street. (Dumond Decl. ¶ 10.) Defendant further states at least 265,245 shifts worked by non-administrative putative class members were either fully or partially worked on North Island or 32nd Street, and of those, 71,623 shifts were split between time on a federal enclave and the Shipyard. (Doc. No. 128 at 18.) Moreover, because "the times of day spent in each location were not recorded for the Named Plaintiffs, nor for any putative class members, including temp workers," Defendant asserts Plaintiffs' theories of liability cannot be decided in "one stroke." (*Id.* at 17–18.)

In response, Plaintiffs argue Defendant's federal enclave defense will not result in predominantly individualized issues because only 8% of shifts for non-administrative employees were split between locations, and that the divided shift issue is a policy anomaly because employees were not supposed to split their shifts. (Doc. No. 138 at 8 n.6 (citing Dumond Decl. ¶ 10 (stating "there were 71,623 work shifts (8.37%) in which the employee split the shift between the North Island/32nd Street location and another work location")).)

28

Plaintiffs further respond that Defendant's inability to identify hours worked on those 8% of shifts results from its own failure to comply with California recordkeeping law, California Labor Code section 1174, IWC Wage Order No. 9-2001, subd. 6(A), and therefore, it is Defendant's burden to identify which hours are not subject to California law. (*Id.* at 9 (citing *Aguiar v. Cintas Corp. No. 2*, 144 Cal. App. 4th 121, 134 (2006), *disapproved on other grounds by Noel v. Thrifty Payless, Inc.*, 7 Cal. 5th 955 (2019).)

First, upon the Court's reading of Labor Code section 1174 and IWC Wage Order No. 9-2001, subd. 6(A), the Court does not find an explicit requirement for an employer to keep record of where an employee works if their work is split between locations. Rather, the "split shift" referred to in IWC Wage Order No. 9-2001, subd. 6(A), refers to intervals in which an employee works one shift for several hours and then is required to return to work several hours later for an additional shift. *See, e.g.*, *Barajas v. Tharaldson Hosp. Staffing, LLC*, No. 5:19-cv-01275-AB (KKx), 2019 WL 8013414, at *4 (C.D. Cal. Oct. 22, 2019); *Lopez v. Wendy's Int'l, Inc.*, No. CV 11-00275 MMM (JCx), 2012 WL 13014600, at *12 (C.D. Cal. June 14, 2012).

However, even if Defendant is not required by law to keep records of the work location of its employees, Defendant cannot defeat class certification by its failure to record such information. *See Dynabursky v. AlliedBarton Sec. Servs. LP*, No. 8:12-cv-2210-JLS (RNBx), 2014 WL 1654030, at *4 (C.D. Cal. Apr. 24, 2014) (stating that "even if Defendant is not specifically required by law to keep records of which employees take on-duty meal breaks, Defendant's failure to record such information is not a basis to defeat class certification"); *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1190 (2008) (shifting burden of proof to defendant to show which class members did not perform work where wages were governed by city's Living Wage Ordinance ("LWO"), even though LWO did not require defendant to keep records distinguishing LWO work from other work); *Aguiar*, 144 Cal. App. 4th at 134–35, ("To the extent questions arise later in the litigation about how to determine which putative class members worked at least 20 hours per month on [LWO contracts] . . . that burden falls on [defendant]. It was [defendant's]

29

business decision to commingle [LWO contracts] with those of other customers and to allow all employees to work on the items . . . .").

Further, the Court finds individualized issues do not predominate here. As explained above, a common legal question exists, the answer to which will resolve these claims. Moreover, the individual inquiries into the locations and hours employees worked do not predominate over the common questions, and these issues are subject to common proof. Defendant's Rule 30(b)(6) witness, Dawn Angrisani, testified that an employee's locations and number of hours worked in that location could be determined through records of gate swipe and charge code data. (Deposition of Dawn Angrisani, ("Angrisani Depo."), Doc. No. 138-2, at 28–30.) Ms. Angrisani further stated that supervisors notified employees the day before that they had to report outside of the Shipyard, to either 32nd Street or North Island, and then the employee had two options: to either report straight to that reporting station or go to the Shipyard to take provider transportation to that location. (*Id.* at 24–25.) Whether the employee chose to go directly to that location or took the provider transportation, there was a time clock that the employee would use at that location once they were ready to start their shift. (*Id.* at 25.) Therefore, even though Plaintiffs' claims potentially presents some individual issues, those individual issues are subject to common proof and do not predominate over the common questions.

### iv.    Failure to Reimburse Business Expenses

The Labor Code requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Lab. Code § 2802(a). Plaintiffs argue common questions predominate, including whether (1) Plaintiffs and class members were required to expend such amounts on cellphones, tools, protective gear, and books, and (2) whether Defendant compensated Plaintiffs and class members for these expenses. (Doc. No. 113-1 at 24.) Specifically, Plaintiffs assert employees were required to use their personal cell phones to communicate because they were not provided with a communication device for work-related issues, and were not reimbursed for their cellphone usage. (*Id.* at 23.)

30

Moreover, Plaintiffs claim they were not fully reimbursed for the costs of tools, protective gear, and work boots that were required to discharge their duties and work in a safe manner. (*Id.* at 24.) To support these claims, Plaintiffs provide declarations from class members who state they were not reimbursed for expenses related to use of personal cellphones or the purchase of tools, personal protective equipment ("PPE"), and boots. (*Id.* at 23 n.27 & 24 n.28.)

Defendant responds its reimbursement policies were lawful and that Plaintiffs cannot establish class-wide liability regarding business expenses. (Doc. No. 128 at 19.) However, this amounts to a merits inquiry that the Court need not reach at this stage. *See Amgen Inc.*, 568 U.S. at 466 ("[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied). As to Defendant's argument that administrative employees did not incur cellphone and tool expenditures, Plaintiffs agree to limit both reimbursement subclasses—cellphone and tools/equipment—to only non-administrative employees. (Doc. No. 138 at 17.) Defendant further contends it supplied tools, PPE, and radios to those who required them, and provided allowances for tools and boots for certain workers. (Doc. No. 128 at 20.)

The Court finds Plaintiffs have not demonstrated that the questions of necessity or knowledge can be answered with common evidence. Although Plaintiffs offer twelve declarations from class members, only one suggested that Defendant was aware he was incurring unreimbursed business expenses. (*See* Cabrales Decl. ¶ 30.) The remainder of Plaintiffs' class member declarants do not mention the issue, raising a doubt as to the existence of a uniform, unofficial policy. Moreover, Plaintiffs offer no way of determining when, or to what extent, class members incurred unreimbursed business expenses. Plaintiffs also fail to offer a reliable method to determine liability, and the Court finds that liability would need to be determined on a class-member-by-class-member basis. *See Dilts v. Penske Logistics, LLC*, No. 08-cv-318-CAB (BLM), 2014 WL 866954, at *7 (S.D. Cal. Feb. 19, 2014) (decertifying a class after finding that the "determination of whether class

members were wrongfully required to buy tools . . . involves too many individualized questions for class-wide resolution. For instance, who purchased tools, did they inform [Defendant], and did they seek reimbursement? Were the tools the employees bought to supplement tools provided by [Defendant] in fact necessary[?]"); *see also Chavez v. Lumber Liquidators*, No. CV-09-4812 SC, 2012 WL 1004850, at *10 (N.D. Cal. Mar. 26, 2012) ("[T]o assess the merits of Plaintiffs' reimbursement claim, the Court would need to scrutinize each class member's claimed expenses. Specifically, the Court would need to make individualized factual determinations concerning: (1) whether the claimed expenses were 'necessary' and incurred in direct consequence of the discharge of the employee's duties; (2) whether the employee actually sought reimbursement from LLI for the expenses; and (3) whether LLI reimbursed the employee for the expense.").

Thus, the Court **DENIES** class certification of the Reimbursement Cellphone and the Reimbursement Personal Protective Gear and Tools/Equipment Subclasses.

### v.     Meal and Rest Break Claims

Next, Plaintiffs assert common questions predominate as to their meal and rest break claims, including (1) whether Defendant failed to provide employees with full meal and rest breaks due to time spent walking to and from break areas, security checks, donning/doffing, and tending to equipment, and (2) whether Defendant provided late first meal breaks and denied second meal breaks altogether. (Doc. No. 113-1 at 25.)

#### Time Spent to and from Meal and Rest Breaks

First, Defendant argues many putative class members worked in offices or dockside where there was no transit time to meal or rest areas; not all employees wore protective gear; and for those working on ships, security protocols differed with each vessel. (Doc. No. 128 at 21.) Defendant further claims hundreds of non-exempt workers did not have to walk from a ship to a rest area for breaks as alleged, and that many employees, including Named Plaintiffs, could take a break at their desk or a break area near their workstations. (*Id.*) Moreover, Defendant contends it sought to avoid meal and rest period disputes by educating and having employees regularly review company policy and either certify

32

compliance or make a report otherwise. (*Id.*) Defendant additionally points out there was no consistent process in place for security protocols, and that donning and doffing related to meal and rest periods was not a universal issue given that many employees wore no protective gear at all. (*Id.* at 22–23.) In the Shipyard, Defendant asserts its horns gave employees a five-minute warning so they had time to get to the rest area in advance of the 10 a.m. meal period, and employees were not expected to return to their workstations until after the final 10:30 a.m. horn sounded. (*Id.* at 22.) Defendant states the Shipyard "shuts down completely during meal periods, thus exempting [it] from meal period recordkeeping requirements for its production workers." (*Id.* (citing IWG Wage Order No. 9-2001 Sec. 6(a)(3) ("Meal periods during which operations cease . . . need not be recorded.")).) Defendant offers testimony from numerous proposed class members supporting the above statements.

Even assuming Plaintiffs' legal theories are correct, the Court would have to probe into the duration of each employee's meal and rest periods for each shift in order to determine Defendant's liability for the meal and rest period violations alleged in this case. Further, Plaintiffs have not presented evidence of a policy requiring non-exempt employees to don their protective gear before clocking in or doff their gear after clocking out, *see Vasquez v. Kraft Heinz Foods Co.*, No.: 16-cv-2749-WQH-BLM, 2018 WL 4896072, at *11 (S.D. Cal. Oct. 9, 2018), or subjecting employees to security protocols while off-the-clock. Determining whether an employee was required to don protective gear before clocking in or to doff protective gear after clocking out, whether they wore protective gear at all, and whether their meal or rest break was shortened due to the horn-to-horn system will require individual factual inquiries into the instructions given to each employee. The Court therefore finds that individualized questions about (1) the actual duration of each employee's individual meal and rest periods, and (2) how long it took each employee to undergo security screening, walking to and from break areas, donning/doffing, and tending to equipment predominate over common questions regarding Defendant's practices. The

significant numbers of declarations provided by Defendant contradicts those provided by Plaintiffs and underscores that individual, rather than common, issues predominate.

Thus, the Court **DENIES** class certification as to the Meal Break Subclass and the Rest Break Subclass to the extent they are based upon time spent walking to and from break areas, security checks, donning/doffing, and tending to equipment.

### Late First Meal Breaks and Second Meal Breaks

Next, Defendant states when employees reported they were unable to take a meal or rest period due to work obligations, it paid them a premium payment. (Doc. No. 128 at 24.) Between May 17, 2022 and June 1, 2023, Defendant paid approximately $54,479.64 in meal period premiums (representing 1,735 premiums paid), and $77,721.75 in rest period premiums (representing 2,438 premiums paid) to putative class members. (*Id.*) To this point, Plaintiffs reply there is no evidence indicating Defendant made any meal break premium payments before May 2022, and that Defendant's records nonetheless show a 13.6–14.8% rate of violation for first meal periods and at a rate of 96.8% for second meal periods. (Doc. No. 138 at 12.)

Here, the damages for each putative class member can be determined by resort to Defendant's timekeeping records, weekly payroll data, and meal period logs. Moreover, Defendant's argument goes to the merits, rather than the issue of predominance. Accordingly, common issues predominate over questions affecting only individual members of the Meal Break Subclass and the Second Meal Break Subclass as to the question of whether Defendant provided late first meal breaks and denied second meal breaks altogether.

### vi.    Wage Statements

Plaintiffs assert their wage statements before August 2021 did not comply with Labor Code section 226(a)(2) because it did not clearly set forth "total hours worked." (Doc. No. 113-1 at 27.)

California Labor Code section 226(a) requires that "employers must provide accurate itemized statements of wages to their employees." Subdivision (a) of the statute

34

sets forth specific information that must be included in the wage statements. In relevant part, it says, "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees. . . an accurate itemized statement in writing showing . . . (2) total hours worked by the employee . . . ." Cal. Lab. Code § 226(a)(2).

In wage statement cases, courts have held that predominance is satisfied if the employer provides its employees with "wage statements in substantially the same format" that are deficient in the same ways. *Morgan v. Rohr, Inc.*, No.: 20-cv-574-GPC-AHG, 2022 WL 974334, at \*20 (S.D. Cal. March 31, 2022). Where the wage statements are so formatted, there is "common proof," i.e., the wage statements, that make the question of the legality of those statements capable of classwide resolution. *Id.*; *see also Gomez v. J. Jacobo Farm Lab. Contractor, Inc.*, 334 F.R.D. 234, 265 (E.D. Cal. 2019) (finding that where alleged deficiencies universally apply across a wage statement class, common questions predominated).

Defendant does not dispute that common issues predominate here. (*See generally* Doc. No. 128.) Moreover, whether the lack of the total hours line on Defendant's wage statements violates section 226(a) is a common question, and Plaintiffs have established these common questions predominate over individual ones with respect to their Wage Statement Subclass.

### vii.   Minimum Wage and Overtime

Further, Plaintiffs assert their minimum wage and overtime claims present common questions, including (1) whether employees were under Defendant's control and entitled to pay during the time waiting to badge in at the turnstiles and waiting to undergo security screenings and submitting to such screenings; (2) whether employees were under Defendant's control and entitled to pay during meal and rest break security screenings and for walking time; (3) whether Defendant's rounding policies were lawful; and (4) whether Defendant properly calculated the regular rate of pay for overtime. (Doc. No. 113-1 at 19.)

///

///

35

**Security Screenings**

The California Supreme Court has held that "hours worked" include "time spent on the employer's premises waiting for, and undergoing, required exit searches of packages, bags, or personal technology devices voluntarily brought to work purely for personal convenience by employees[.]" *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1042 (2020).

Plaintiffs first state that from the beginning of the class period through March 2020, Defendant failed to pay for all hours worked because employees were required to badge-in at a turnstile and to pass through security screenings prior to clocking in. (Doc. No. 113-1 at 19.) Plaintiffs further assert that at the end of their shifts, Defendant required employees to clock out before proceeding to security, passing through the turnstiles, and leaving the Shipyard. (*Id.*)

In response, Defendant asserts individual issues predominate because not all workers carried bags and that employees without bags did not undergo security checks at all. (Doc. No. 128 at 27.) However, Defendant fails to offer evidence in support of this. (*See generally id.*) Further, Defendant contends that 65% of declarants whose bags were checked before clock-in testified that the process took less than five seconds, and that only 5% of declarants stated the process took more than 31 seconds. (Doc. No. 128 at 26–27 (citing Declaration of Michelle May, Doc. No. 128-26, ¶ 16) & n.26 (citing *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)).) Defendant also asserts declarants state there were no long lines to go through the turnstiles to enter the Shipyard. (*Id.* (citing Deposition of Julie Stey, Doc. No. 128-18, at 5).)

Defendant's assertion of the *de minimis* defense does not defeat predominance. The amount of time worked need not be significant; a few minutes can be sufficient for an off-the-clock claim. Importantly, the California Supreme Court in *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 848 (2018), recently rejected the federal *de minimis* rule for claims of unpaid wages under California law. "An employer that requires its employees to work minutes off the clock on a regular basis or as a regular feature of the job may not evade the obligation to compensate the employee for that time by invoking the *de minimis* doctrine." *Id.* at 847.

The Court finds common questions predominate individualized issues, namely, whether employees were under Defendant's control and entitled to pay during the time waiting to badge in at the turnstiles, waiting to undergo security screenings and submitting to such screenings, during meal and rest break security screenings, and for walking time. While there may be variations in the duration that putative class members waited in line, that issue goes to damages and the above questions predominate over any questions affecting individual class members. *See Ornelas v. Tapestry, Inc.*, No. C 18-06453 WHA, 2021 WL 3471173, at *4 (N.D. Cal. Aug. 6, 2021) (finding predominance where "[i]n the event that defendant loses on the merits, it will be necessary to litigate the issue of who actually stood in line and for how long").

### Rounding Policies

Plaintiffs further assert Defendant maintained a uniform rounding policy which resulted in systematic underpayment of wages to its employees in violation of California labor law. (Doc. No. 113-1 at 21); *see Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1009 (9th Cir. 2018) ("A rounding-time policy is permissible under California law if it is fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.") (citing *See's Candy Shops, Inc. v. Super. Ct.*, 210 Cal. App. 4th 889, 895 (2012)). Specifically, Plaintiffs claim Defendant "calculated the difference between employees' clock-in and clock-out time to the minute and then rounded the result to the nearest quarter hour." (Doc. No. 113-1 at 21.)

Defendant responds that its rounding policy was neutral over time, and thus lawful. (Doc. No. 128 at 28 (citing 29 C.F.R. § 785.48(b)).) However, this again amounts to a merits inquiry that the Court need not reach at this stage. *See Amgen Inc.*, 568 U.S. at 466.

The Court agrees with Plaintiffs that this is a common issue that can be addressed on a class-wide basis. Defendant does not deny this is a uniform policy that applies to all non-exempt workers. As to Defendant's argument that class certification would require individualized inquiries into whether a particular employee was underpaid or overpaid for

a particular period of time, the Court sees no reason why a sampling of employee records could not be undertaken to determine whether, overall, Defendant's rounding practice is fair and neutral on its face and is implemented fairly.

### Regular Rate of Pay

Plaintiffs next argue Defendant failed to properly calculate the regular rate of pay by way of a uniform payroll practice of calculating overtime premiums using the base hourly rate rather than the regular rate of pay. (Doc. No. 113-1 at 22–23.) Plaintiffs assert common issues predominate because "[c]ommon proof in the form of BAE's timekeeping and payroll records will establish that, prior to September 10, 2022, BAE uniformly paid overtime at 1.5 times the base hourly rate rather than 1.5 times the regular rate of pay . . . ." (*Id.* at 23.)

Defendant responds that although there was a regular rate problem, it took steps to rectify the issue before the filing of this lawsuit when the California Supreme Court issued its decision in *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal. 5th 858, 878 (2021). (Doc. No. 128 at 27.) After Defendant reviewed *Ferra*, which was given retroactive effect, it alleges it undertook a thorough investigation to determine the amounts owed to all employees affected from July 15, 2017, through September 2022. (*Id.*) Defendant states that after paying out all such amounts, including interest owed to the date of payment, it also corrected its regular rate calculation going forward. (*Id.*) However, Defendant again argues issues that go to the merits which the Court need not address here.

Because the calculation of the regular rate of pay was a uniform payroll practice which can be determined by common proof in the form of Defendant's timekeeping and payroll records, the Court finds common issues predominate over individualized issues here.

### viii.   Derivative Claims

Plaintiffs lastly assert their claims for failure to pay final wages, waiting time penalties, failure to furnish accurate wage statements (due to unpaid overtime, minimum wages, and meal and rest period premiums), and unfair and unlawful business practices are

38

derivative of their other claims. (Doc. No. 113-1 at 28.) Thus, assert Plaintiffs, where common issues predominate with respect to these claims, the derivative claims should also be certified. (*Id.* (citing *Westfall v. Ball Metal Beverage Container Corp.*, No. 216CV0263KJMGGH, 2019 WL 202677, *1 (E.D. Cal. Jan. 15, 2019)).)

The Court finds these derivative claims are suitable for class certification, but only as it relates to the subclasses and underlying claims that this Court has granted class certification in the preceding sections of this Order.

### b. Superiority

If a court finds that the proposed class or subclass satisfies the commonality and predominance requirements of Rule 23(b)(3), the court must also determine whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed R. Civ. P. 23(b)(3). To determine whether a class action is superior to alternative methods of adjudicating a case, a court considers: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already brought by or against proposed class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing the class. Fed. R. Civ. P. 23(b)(3)(A)–(D). Consistent with the aim of the Federal Rules of Civil Procedure to promote judicial economy, a class action is the superior method for resolution "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Cartier-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Wage and hour disputes are frequently litigated as class actions. *See Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524, 1538 (2008).

Plaintiffs maintain that a class action is a superior method of adjudicating putative class members' claims against Defendant. (Doc. No. 113-1 at 31.) They argue "[c]lass treatment is superior to hundreds of individual actions[,]" there is no other pending litigation asserting the same claims as Plaintiffs, "this forum is desirable because the class

members worked in California and California substantive state law will govern the outcome of this case," and because the class action will be manageable. (*Id.*)

Defendant responds that Plaintiffs' trial plan does not demonstrate manageability, and thus Plaintiffs' motion should be denied. (Doc. No. 128 at 29.) Specifically, Defendant argues the trial plan fails to provide the Court with a basis for concluding that representative proof offered by Plaintiffs can be rationally extrapolated to the entire class, and that the plan fails to acknowledge the varying groups of workers, each with different work experiences concerning the remaining wage statements and regular rate calculation subclasses. (*Id.* at 29–31.)

However, as previously discussed above, *supra* Section III.C.2.a.ii, the Court finds the representative proof offered by Plaintiffs can be extrapolated to the entire class. Moreover, Defendant's arguments as to wage statements and the regular rate issue largely recite their issues as to predominance, which the Court has discussed above. Considering the superiority prong's four factors, the Court finds a class action is the superior method for resolving the claims Plaintiffs allege against Defendant.

### D.   Conclusion

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for class certification. Specifically, the Court **GRANTS** class certification as to the following subclasses:

1. **Minimum Wage Security Subclass**;
2. **Overtime Security Subclass**;
3. **Rounding Minimum Wage Subclass**;
4. **Rounding Overtime Subclass**;
5. **Overtime Regular Rate of Pay Subclass**;
6. **Meal Break Subclass** (to the extent it is based upon whether Defendant provided late first meal breaks);
7. **Second Meal Break Subclass** (to the extent it is based upon whether Defendant denied second meal breaks altogether); and
8. **Wage Statement Subclass**.

The Court further **GRANTS** Plaintiffs' motion to appoint Plaintiffs as class representatives

and to appoint Matern Law Group, PC as class counsel. Finally, the Court **DENIES WITH LEAVE TO AMEND** the following subclasses:

1. **Meal Break Subclass** (to the extent it is based upon whether Defendant failed to provide employees with full meal breaks due to time spent walking to and from break areas, U.S. Navy checks, donning/doffing, and tending to equipment);
2. **Rest Break Subclass** (to the extent it is based upon whether Defendant failed to provide employees with full rest breaks due to time spent walking to and from break areas, U.S. Navy checks, donning/doffing, and tending to equipment);
3. **Reimbursement Cellphone Subclass**; and
4. **Reimbursement Personal Protective Gear and Tools/Equipment Subclass**.

With this motion practice now complete, the Court orders counsel to jointly contact Magistrate Judge Leshner's Chambers within the next 14 days to schedule a Case Management Conference to set a period for any remaining discovery and dates for Pretrial Disclosures, and a Final Pretrial Conference and its requisites.

**IT IS SO ORDERED.**

Dated:  December 6, 2023

Hon. Anthony J. Battaglia
United States District Judge

41