1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FEDERICO CABRALES, individually and on behalf of others similarly situated,

Plaintiff,

v.

BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC., a California corporation; and DOES 1 through 50, inclusive,

Defendant.

Case No.: 21-cv-02122-AJB-DDL

**ORDER:**

**(1) GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT;**

**(2) GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

**(Doc. Nos. 185; 186)**

Before the Court is a motion for final approval of class action and PAGA settlement (Doc. No. 185) and a motion for award of attorneys' fees, costs, and class representative service payment (Doc. No. 186), both filed by Plaintiffs Federico Cabrales and Tychicus Stanislas ("Plaintiffs" or "Class Representatives"). Defendant BAE Systems San Diego Ship Repair, LLC's ("Defendant" or "BAE") did not file an opposition to either motion. To date, no objections have been filed or otherwise brought to the Court's attention. (*See* Doc. Nos. 185-1 at 19; 191 at 4; *see* Docket *generally*.) For the reasons set forth below, the

1

Court **GRANTS** Plaintiffs' motion for final approval and **GRANTS** Plaintiffs' motion for attorneys' fees, costs, and Plaintiffs' service payment.

## I.    BACKGROUND

### A.    Procedural Background

On October 26, 2021, Plaintiffs filed a putative class action complaint against Defendant in the Superior Court of California, County of San Diego, which Defendant removed to this Court on December 23, 2021, pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1442(a)(1). (Doc. No. 1.) In their operative complaint, Plaintiffs allege claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), the California Private Attorneys' General Act, California Labor Code § 2698, *et seq.* ("PAGA"), and other California state labor laws on behalf of themselves and other employees of Defendant. (Second Amended Complaint ("SAC"), Doc. No. 21.) Specifically, Plaintiffs bring claims for: (1) unpaid meal period premiums; (2) unpaid rest period premiums; (3) unpaid overtime; (4) unpaid minimum wages; (5) final wages not timely paid; (6) failure to provide accurate wage statements; (7) failure to reimburse expenses; (8) violation of California Business and Professions Code § 17200, *et seq.*, ("UCL"); and (9) failure to pay straight and overtime compensation. (*Id.*)

On December 30, 2021, Defendant filed its first motion to dismiss Plaintiffs' Complaint. (Doc. No. 6.) On January 20, 2022, Plaintiffs filed the First Amended Complaint ("FAC"), thereby mooting the motion to dismiss. (Doc. No. 9.) Thereafter, on February 24, 2022, Defendant filed a motion to dismiss the FAC and to strike Plaintiffs' class and collective allegations. (Doc. No. 13.) The Court granted in part and denied in part the motion to dismiss and denied the motion to strike. (Doc. No. 20.) On August 12, 2022, Plaintiffs filed the operative SAC. (Doc. No. 21). On January 4, 2023, the Court granted the parties' joint motion to dismiss Named Plaintiff Steve Whidbee, (Doc. No. 36), and on June 28, 2023, the Court granted in part Defendant's motion to dismiss Named Plaintiff Tony Fuga with prejudice, (Doc. No. 101).

On July 26, 2023, Plaintiffs filed a motion to certify class, (Doc. No. 113), and on

September 1, 2023, Defendant filed a motion for partial summary judgment, (Doc. No. 126). On December 6, 2023, the Court granted in part and denied in part Defendant's motion for partial summary judgment, and granted in part and denied in part Plaintiffs' motion for class certification. (Doc. No. 142.) Specifically, the Court granted summary judgment as to Plaintiffs' state law claims as they applied to 32nd Street and North Island due to the federal enclave doctrine, and as to Plaintiff Stanislas' FLSA claim, and denied summary judgment of Plaintiffs' collective FLSA claim. (*Id.* at 17.) The Court also granted certification of the following subclasses: (1) Minimum Wage Security Subclass; (2) Overtime Security Subclass; (3) Rounding Minimum Wage Subclass; (4) Rounding Overtime Subclass; (5) Overtime Regular Rate of Pay Subclass; (6) Meal Break Subclass (to the extent it is based upon whether Defendant provided late first meal breaks); (7) Second Meal Break Subclass (to the extent it is based upon whether Defendant denied second meal breaks altogether); and (8) Wage Statement Subclass. (*Id.* at 40.) The Court denied class certification with leave to amend as to the following: (1) Meal Break Subclass (to the extent it is based upon whether Defendant failed to provide employees with full meal breaks due to time spent walking to and from break areas, U.S. Navy checks, donning/doffing, and tending to equipment); (2) Rest Break Subclass (to the extent it is based upon whether Defendant failed to provide employees with full rest breaks due to time spent walking to and from break areas, U.S. Navy checks, donning/doffing, and tending to equipment); (3) Reimbursement Cellphone Subclass; and (4) Reimbursement Personal Protective Gear and Tools/Equipment Subclass. (*Id.* at 41.)

On November 17, 2023, Defendant mailed out a packet to putative class members containing a cover letter, a copy of the SAC, Plaintiffs' notice to the Labor and Workforce Development Agency ("LWDA"), a Release of Claims, Frequently Asked Questions, a self-addressed stamped envelope, and a settlement check (together, the "Direct Settlement Campaign"). (Doc. No. 145 at 2.) On December 5, 2023, Plaintiffs filed an *ex parte* application for an order (1) prohibiting Defendant from further communications with putative class members regarding the claims at issue in the case, and (2) requiring

Defendant to provide Plaintiffs' counsel with the identity and contact information for all putative class members to whom Defendant sent settlement communications and who had purportedly released their claims by signing the settlement check and/or release. (Doc. No. 141.) On December 12, 2023, the Court granted in part and denied in part the *ex parte* application. (Doc. No. 145.) Specifically, the Court found moot Plaintiffs' first request to prevent Defendant from further communications with putative class members, as the Court by then had granted the motion to certify class. (*Id.* at 7–8.) Moreover, the Court granted the *ex parte* application as to Plaintiffs' second request for the identity and contact information for the putative class members contacted by Defendant. (*Id.* at 8.) On January 24, 2024, a third-party administrator mailed the corrective letter to class members who were sent the Direct Settlement Campaign. (Declaration of Matthew Matern ("Matern Decl."), Doc. No. 179-4, ¶ 14.)

Defendant paid a total gross amount of $1,502,955.87 in individual settlement payments through the Direct Settlement Campaign. (*Id.* ¶ 15; Declaration of Gillian McCreedy, Doc. No. 179-7, ¶ 3.) Approximately 1,379 individuals who were sent the Direct Settlement Campaign cashed the settlement check and/or signed a release of the claims at issue in this action, for an estimated average payment of $1,089.89 per Settlement Class Member. (Matern Decl. ¶¶ 16–17.)

## B. Settlement Negotiations

On December 1, 2022, the Parties attended an Early Neutral Evaluation ("ENE") conference, which was unsuccessful. The Parties also attended an unsuccessful private mediation with Jeffrey Krivis on December 23, 2022.

After the Court granted class certification, the Parties attended private mediation with Hunter Hughes on February 16, 2024. After the mediation, on February 19, 2024, Mr. Hughes made a mediator's proposal outlining the material terms of a proposed class action settlement. The Parties did not accept the proposal but continued to negotiate the terms of a proposed Memorandum of Understanding ("MOU"). On March 11, 2024, the Parties fully executed the MOU, which called for the parties to enter into a long-form settlement

4

agreement. On October 21, 2024, the Parties fully executed the Settlement. The same day, Plaintiffs' counsel submitted the Settlement to the LWDA, pursuant to Labor Code § 2699(s)(2).

### C. Settlement Agreement and Preliminary Approval

On October 21, 2024, Plaintiffs filed a motion for preliminary approval of the class action and PAGA settlement (Doc. No. 179), which Defendant did not oppose. The Court granted Plaintiffs' motion and entered the order granting preliminary approval (the "Preliminary Approval Order"), which *inter alia* approved the Notice in form and content, appointed Phoenix Settlement Administrators ("PSA") as Settlement Administrator, set administrative dates, conditionally certified the class and remaining claims for failure to provide meal and rest periods and failure to reimburse necessary expenditures, and tentatively approved the Settlement. (Doc. No. 181.)

On May 1, 2025, Plaintiffs filed the instant motions for final approval and for award of attorneys' fees, expenses, and Plaintiffs' service payment. (Doc. Nos. 185; 186.) In support of the motion for final approval, Plaintiffs filed two declarations from each of the Class Representatives, (Doc. No. 185-2, "Cabrales Decl."; Doc. No. 185-3, "Stanislas Decl."), a declaration by Plaintiffs' counsel, Matthew W. Gordon (Doc. No. 185-4, "Gordon Decl."), and a declaration from the Settlement Administrator, Mayra J. Gonzalez (Doc. No. 185-7, "May 1, 2025, Gonzalez Decl."). Gonzalez submitted true and correct copies of the mailed notice, the Class Action Fairness Act (CAFA) notice, and PSA's invoice as exhibits to her declaration. (*See* Doc. Nos. 185-8; 185-9; 185-10.)

In support of Plaintiffs' fees motion, Plaintiffs submitted a declaration by Matthew J. Matern of Matern Law Group ("MLG") (Doc. No. 186-2, "MLG Decl."), a declaration by Michael Rubin (Doc. No. 186-17, "Rubin Decl."), and additional documentation including itemized time entries (Doc. Nos. 186-9; 186-10), attorney costs (Doc. Nos. 186-11; 186-12), and billing invoices corresponding to the costs incurred (Doc. No. 186-13.) Both Class Representatives also filed declarations in support of Plaintiffs' requested

service payments. (*See* Doc. No. 186-15, "Cabrales" Decl. ISO Service Payment"; Doc. No. 186-16, "Stanislas Decl. ISO Service Payment.")

On May 14, 2025, Mayra J. Gonzalez, signed an additional declaration detailing the PSA's progress to date with notice and claims administration. (*See* Doc. No. 188, "May 14, 2025, Gonzalez Decl.") The first May 1, 2025, Gonzalez Declaration reported zero returned notices, zero requests for exclusion, zero notices of objection, and one Workweek dispute, which was later resolved. (May 1, 2025, Gonzalez Decl. ¶¶ 7–10.) The subsequent May 14, 2025, Gonzalez Declaration states that PSA received a timely and valid Request for Exclusion postmarked April 17, 2025. (May 14, 2025, Gonzalez Decl. ¶ 2.) As of the date of the May 14, 2025, Gonzalez Declaration, 2,435 Settlement Class Members did not submit timely and valid Requests for Exclusion. (*Id.* ¶ 3.) After subtracting the 1,274 Settlement Class Members with zero Workweeks in the Class Period, there remain 1,162 Participating Settlement Class Members. (*Id.*) Collectively, those 1,162 Participating Settlement Class Members worked a total of 67,946 Workweeks during the Class Period. (*Id.*) The May 14, 2025, Gonzalez Declaration does not comment on any other known objections, returned notices, or disputes. (*See id.*)

On July 24, 2025, the Court held hearings on both motions. No objectors appeared. To date, the Court has not been made aware of any objections. (*See* Doc. No. 191 at 4.)

## II.    SETTLEMENT AGREEMENT

Plaintiffs and Defendant have executed a Joint Stipulation of Class Action Settlement ("Settlement Agreement" or "Settlement"). (Settlement, Doc. No. 185-6.) The primary terms of Settlement are provided below.

### A.    Settlement Class Members

"Settlement Class Members" means (1) all current and former California based non-exempt employees of BAE who worked at least one Workweek during the Class Period, (2) all current and former California based non-exempt employees of Acro Service Corporation ("Acro") who were placed to work at BAE for at least one Workweek during the Class Period, and (3) all current and former California based non-exempt employees of

NSC Technologies, LLC ("NSC") who were placed to work at BAE for at least one Workweek between August 9, 2021 and the end of the Class Period. (Settlement ¶ 34.) "Class Period" means the period from October 26, 2017, through June 1, 2024.[1] (*Id.* ¶ 6.)

"Participating Settlement Class Members" means all Settlement Class Members who (1) did not submit a timely and valid Request for Exclusion and (2) did not previously settle the alleged claims at issue in the Action through an individual settlement agreement with Defendant BAE, including but not limited to through the November 17, 2023 Direct Settlement Campaign. (*Id.* ¶ 23.)

There are 2,436 Settlement Class Members through the end of the Class Period, including 1,274 Settlement Class Members who participated in the Direct Settlement Campaign or otherwise directly settled the claims at issue in the lawsuit.[2] (Gordon Decl. ¶ 19; May 1, 2025, Gonzalez Decl. ¶ 3.) There are 1,162 Participating Settlement Class Members who worked a total of 67,946 Workweeks during the Class Period. (May 1, 2025, Gonzalez Decl. ¶ 11.) Those Settlement Class Members who previously settled the claims at issue in the action will not be eligible to receive an additional Individual Settlement Payment as part of this Settlement, but they will remain eligible for an Individual FLSA Payment and an Individual PAGA Payment, if they qualify for those payments.[3]

---

[1]    The Class Period for employees placed to work at BAE by NSC starts on August 9, 2021, because of a prior settlement involving NSC employees in *Thompson v. NSC Technologies, LLC*, Case No. 3:20-cv-00371-JLS(MSB), which released claims through August 8, 2021. (Settlement ¶ 34.)

[2]    In Plaintiffs' Motion for Preliminary Approval, Plaintiffs originally estimated that 2,582 Settlement Class Members existed and that 1,379 Settlement Class Members with zero class Workweeks participated in the November 17, 2023, Direct Settlement Campaign. However, after the Class List was provided to the Settlement Administrator, BAE's counsel informed Plaintiffs' counsel that some of the Settlement Class Members had been double counted if they worked at BAE through a staffing company during the Class Period and later were directly hired by BAE. (Doc. No. 185-1 at 13; *see also* May 1, 2025, Gonzalez Decl. ¶ 3.) Upon accounting for this "double counting," the Settlement Administrator reports that there exist 2,436 Settlement Class Members and 1,274 individuals with zero class Workweeks who participated in the November 17, 2023, Direct Settlement Campaign.

[3]    The scope of the release entered into by Settlement Class Members who accepted an individual settlement with Defendant through the Direct Settlement Campaign excluded claims under PAGA and the FLSA. (*See* Doc. No. 141-3 at 3.)

(Settlement ¶¶ 10, 20, 44-45.)

## B.    FLSA Collective Members

"FLSA Collective Members" means (1) all current and former California based non-exempt employees of BAE who worked at least one Workweek during the FLSA Period, (2) all current and former California based non-exempt employees of Acro who were placed to work at BAE for at least one Workweek during the FLSA Period, and (3) all current and former California based non-exempt employees of NSC who were placed to work at BAE for at least one Workweek between August 9, 2021 and the end of the FLSA Period. (*Id.* ¶ 10.) "FLSA Period" means the period from January 20, 2019, through June 1, 2024. (*Id.* ¶ 12.) The definition of "FLSA Collective Members" includes those individuals who previously entered into an individual settlement agreement with Defendant through the Direct Settlement Campaign. (*Id.* ¶ 10.) There are 2,158 FLSA Collective Members who worked a total of 202,511 FLSA Workweeks during the FLSA Period. (May 1, 2025, Gonzalez Decl. ¶ 15.)

## C.    PAGA Members

"PAGA Members" means (1) all current and former California based non-exempt employees of BAE who worked at least one Workweek during the PAGA Period, (2) all current and former California based non-exempt employees of Acro who were placed to work at BAE for at least one Workweek during the PAGA Period, and (3) all current and former California based non-exempt employees of NSC who were placed to work at BAE for at least one Workweek between August 9, 2021 and the end of the PAGA Period. (Settlement ¶ 20.) "PAGA Period" means the period from November 16, 2020, through June 1, 2024. (*Id.* ¶ 21.)

"PAGA Members" includes those individuals who previously entered into an individual settlement agreement with Defendant through the Direct Settlement Campaign. (*Id.* ¶ 48.) PAGA Members who submit a timely and valid Request for Exclusion will nevertheless be entitled to an Individual PAGA Payment and remain subject to the release of PAGA claims. (*Id.* ¶ 61.) Plaintiffs proffer that there are 2,025 PAGA Members who

8

worked a total of 151,951 weeks during the Class Period. (March 1, 2025, Gonzalez Decl. ¶ 14.)

### D.    Settlement Terms

- Defendant BAE will pay a non-reversionary Maximum Settlement Amount of $6,364,467.87, which includes $4,500,000.00 in new funds, plus:

    o The gross amount of $1,502,955.87, which Defendant BAE previously paid to Settlement Class Members through the Direct Settlement Campaign ("Direct Settlement Amount"); and

    o The gross amount of $361,512.00, which Defendant paid to Settlement Class Members through retroactive "true-up" payments issued on March 16, 2023 for unpaid meal and rest period premiums ("Retroactive Payment Amount").[4] (Settlement ¶ 16.)

- Defendant BAE shall receive a credit for the Direct Settlement Amount and the Retroactive Payment Amount such that the total amount of additional funds Defendant will be required to pay in connection with the Settlement is $4,500,000, plus the employer's portion of payroll taxes of that sum as allocated to wages for Settlement Class Members and FLSA Collective Members. (*Id.*)

- The Net Settlement Amount is the amount remaining from the Maximum Settlement Amount after applying the credit Defendant BAE has already paid to Settlement Class Members for the Direct Settlement Amount and the Retroactive Payment Amount and deducting the Class Representative Enhancement Payments, the Class Counsel Award, the Settlement Administration Costs, the FLSA Amount, and the LWDA Payment. (*Id.* ¶ 17.) The entire Net Settlement Amount will be distributed to Participating Settlement Class Members with no reversion. (*Id.*)

---

[4]    On March 16, 2023, Defendant issued "true-up" payments to Settlement Class Members in the aggregate gross amount of $361,512.00 for underpaid meal and rest period premiums. (Gordon Decl. ¶ 18.)

9

- The Maximum Settlement Amount will be allocated as follows. In addition to the Individual Settlement Payments to Participating Class Members, the Net Settlement Amount will be used to pay:

  1. <u>Individual Settlement Payments:</u> The Net Settlement Amount will be distributed to each Participating Settlement Class Member on a pro rata basis according to the number of Workweeks he or she worked for Defendant BAE (or, if an employee of a staffing company, the number off Workweeks that person was placed to work at BAE) during the Class Period (*Id.* ¶ 43);

  2. <u>Individual FLSA Payments:</u> The FLSA Amount ($15,000) will be divided among FLSA Collective Members on a *pro rata* basis according to the number of Workweeks they worked for BAE during the FLSA Period (*id.* ¶¶ 11, 45);

  3. <u>LWDA Payment and Individual PAGA Payments</u>: $100,000 of the Maximum Settlement Amount will be allocated to the resolution of PAGA Members' claims as the LWDA Payment. Pursuant to PAGA, $75,000 of the LWDA Payment will be paid to the LWDA, and $25,000 will be divided among PAGA Members on a *pro rata* basis according to the number of Workweeks they worked for BAE during the PAGA Period (*id.* ¶¶ 11, 44);

  4. <u>Class Representative Enhancement Payment</u>: Plaintiffs Cabrales and Stanislas will each be paid a Class Representative Enhancement Payment not to exceed $20,000 (totaling $40,000.00) (*id.* ¶ 40);

  5. <u>Class Counsel's Fees</u>: Plaintiffs will seek attorneys' fees in a separate application prior to final approval in an amount up to one-third of the Maximum Settlement Amount, including the Direct Settlement Amount and the Retroactive Payment Amount, in the amount of $2,121,489.29, plus litigation expenses not to exceed $200,000 (*id.* ¶ 39);

  6. <u>Settlement Administration Costs</u>: Paid from the Maximum Settlement Amount, the Settlement Administrator will be paid in an amount not to exceed $35,000 (*id.* ¶ 41).

### E.      Releases

In exchange for Defendant's $4,500,000 payment of the Maximum Settlement Amount, Participating Settlement Class Members will release and discharge the Released Parties from the following claims against Defendant:

> [A]ny and all wage-and-hour claims, rights, demands, liabilities and causes of action of every nature and description, whether known or unknown, that arise out of the allegations in the operative complaint, or any amendments thereto, during the Class Period, including unpaid wages, overtime premium pay, meal and rest period premium pay, failure to reimburse business expenses, statutory, constitutional, contractual or common law claims for wages, damages, unpaid costs, penalties, liquidated damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief[.]

(Settlement ¶ 26; *see id.* ¶¶ 29, 58.)

Upon the funding of the $4,500,000, any Settlement Class Member who does not affirmatively opt-out of the Settlement Agreement by submitting a timely and valid Request for Exclusion will be bound by all of its terms. (*Id.* ¶ 59.)

By signing and cashing their settlement check, FLSA Collective Members will consent to opt in to the collective action and will release and discharge the Released Parties from the Released FLSA Claims during the FLSA Period. (*Id.* ¶¶ 27, 60.)

Upon funding of the $4,500,000 Maximum Settlement Amount, PAGA Members, including those who timely and effectively exclude themselves from the Released Class Claims, will release and discharge the Released Parties from the Released PAGA Claims during the PAGA Period. (*Id.* ¶¶ 28, 61.)

### F.      Uncashed Checks

If Settlement Class Members' checks are not cashed within 120 calendar days after mail, those funds will be transferred by the Settlement Administrator to the California State Controller's Office Unclaimed Property Fund in the name of the Settlement Class Member. (*Id.* ¶ 66.)

/ / /

/ / /

11

## III.    MOTION FOR FINAL APPROVAL

### A.    Legal Standard

A class action may only be settled with court approval, "which may be granted only after a fairness hearing and a determination that the settlement taken as a whole is fair, reasonable, and adequate." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(e)(2)). "Courts reviewing class action settlements must 'ensure[] that unnamed class members are protected from unjust or unfair settlements affecting their rights,' while also accounting for 'the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556, 568 (9th Cir. 2019) (en banc)).

### B.    Class Certification

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified. *See* Fed. R. Civ. P. 23(e)(1)(B). "When, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts "must pay undiluted, even heightened, attention to class certification requirements." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).

In the present case, the Court scrutinized the proposed Class and Subclasses pursuant to Rule 23(a) and 23(b)(3) as well as the proposed FLSA Collective Action before granting Plaintiff's motion for preliminary approval and conditionally certifying the class for purposes of settlement. (*See* Doc. No. 181.) The Court noted no concerns at the time, no objections have been filed in response, and no circumstances have changed in the interim. Accordingly, the Court reaffirms and incorporates by reference its prior analysis under Rules 23(a) and (b)(3) as well as its FLSA Collective Action analysis as set forth in its Preliminary Approval Order. (*See id.* at 11–19.)

### C.    Adequacy of Notice

Next, the Court must determine whether the Class Members received adequate

notice. *See* Fed. R. Civ. P. 23(e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by the proposal[.]"). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

As mentioned *supra* § I, the Court approved the proposed notice plan and Class Notice Packet ("Notice"). (Doc. No. 181 at 16–17.) Plaintiffs filed a declaration by the Case Manager for the Settlement Administrator, detailing the actions taken by the Settlement Administrator to provide notice in accordance with the Preliminary Approval Order. (*See generally* May 1, 2025, Gonzales Decl.) Pursuant to the notice plan, the Settlement Administrator disseminated the Notice via U.S. first class mail in English and Spanish to all 2,436 Settlement Class Members on the Class List, none of which were returned undeliverable. (*Id.* ¶¶ 5–7.)

Having reviewed the declaration, the Court finds that the Settlement Administrator duly effectuated the court-approved Notice and that Class Members received adequate notice of the Settlement.

## D. Fairness, Reasonableness, and Adequacy of Proposed Class Action Settlement

Traditionally, courts in this Circuit assess the fairness, reasonableness, and adequacy of a proposed settlement by balancing the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021). "The district court's approval order must show not only that 'it has explored [these] factors comprehensively,' but also that the settlement is 'not[] the product of collusion among the negotiating parties.'" *In re*

13

*Bluetooth*, 654 F.3d at 947 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000)).

In 2018, Rule 23(e)(2) was amended to require courts to consider whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

(i)   the costs, risks, and delay of trial and appeal;

(ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)   any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### 1.   Rule 23(e)(2) Factors

In its Preliminary Approval Order, the Court found that the Rule 23(e)(2) factors preliminarily weighed in favor of approving the Settlement. (*See* Doc. No. 181 at 19–28.) However, the Court also expressed concern about insufficient justification provided for the requested amount of attorneys' fees. (*Id.* at 26–27.) Considering that no pertinent facts the Court relied upon changed, the Court reaffirms and reincorporates by reference its analysis finding the adequacy of relief, adequacy of representation, the lack of collusion, vigorous prosecution, and equitable treatment of class members, which all support the fairness, reasonableness, and adequacy of the Settlement.[5] Accordingly, the Court finds that all Rule 23(e)(2) factors weigh in favor of approval.

/ / /

/ / /

---

[5]   The Court will analyze the requested fees and incentive award when addressing Motion for Award of Attorneys' Fees and Costs, and Service Payment (Doc. No. 186). *See infra* § IV.

14

### 2.    Additional Ninth Circuit Factors

As the amended Rule 23(e)(2) factors were not intended to replace the factors developed by circuits, the Court now turns to analyze the remaining factors traditionally considered by this Circuit.[6] *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

#### i.    Experience and Views of Counsel

In its Preliminary Approval Order, the Court found the experience and views of counsel weighed in favor of approval. (Doc. No. 181 at 28–29.) As no changes to Class Counsel have occurred, no relevant facts have changed, and no objections to Class Counsel have been brought to the Court, the Court reaffirms and incorporates by reference its analysis on this factor and find this factor weighs in favor of settlement approval.

#### ii.    Reaction of Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quoting *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004)).

Here, the Settlement Administrator has not received any objections to the Settlement by Class Members, and only 1 Class Member requested exclusion. (May 1, 2025, Gonzalez Decl. ¶¶ 8, 9; May 14, 2025, Gonzalez Decl. ¶ 2.) The absence of objections and such a low percentage of opt outs weigh in favor of settlement. *See, e.g.*, *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 ("The complete absence of Class Member objections to the Proposed Settlement speaks volumes with respect to the overwhelming degree of support for the Proposed Settlement among the Class Members. That unanimous, positive reaction

---

[6]    As there is no government actor present in the instant action, the Court forgoes analysis of this factor. (*See* Doc. No. 181 at 28 n.4.)

to the Proposed Settlement is compelling evidence that the Proposed Settlement is fair, just, reasonable, and adequate.").

### 3.    Conclusion

Having analyzed the Rule 23(e)(2) factors and the Ninth Circuit's factors, and finding them weigh in favor of approval, the Court finds the Settlement fundamentally fair, adequate, and reasonable. *See Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution[,] especially . . . in complex class action litigation . . . .").

### E.    FLSA Collective Action Settlements

Court approval is also required for settlements of private collective actions under the FLSA. *Seminiano v. Xyris Enter., Inc.*, 602 Fed. App'x 682, 683 (9th Cir. 2015) (citing *Nall v. Mal-Motels, Inc.*, 723 F.3d 1304, 1306 (11th Cir. 2013)). Although "[c]ollective actions [under the FLSA] and class actions [under Rule 23] are creatures of distinct texts . . . that impose distinct requirements," *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018), district courts assess FLSA settlements using a two-step process that is similar to what is required for review of class action settlements under Rule 23. *See Kulik v. NMCI Med. Clinic Inc.*, No. 21-cv-03495-BLF, 2023 WL 2503539, at \*3 (N.D. Cal. Mar. 13, 2023). After assessing whether the members of the proposed collective may proceed in a collective action, the Court must assess whether the proposed settlement is "a fair and reasonable resolution of a bona fide dispute [over FLSA provisions]." *Otey v. CrowdFlower, Inc.*, No. 12-cv-05524-JST, 2014 WL 1477630, at \*3 (N.D. Cal. Apr. 15, 2014) (quoting *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)).

### 1.    FLSA Collective Action

In its Preliminary Approval Order, the Court analyzed whether the members of the proposed collective are "similarly situated" and determined that the allegations supporting Plaintiffs' FLSA claim are similar to their California law claim, justifying certification of

the FLSA collective for settlement purposes. (Doc. No. 181 at 18–19 (citing *v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 948 (9th Cir. 2019)).) The Court noted no concerns at the time, no objections have been filed in response, and no circumstances have changed in the interim. Accordingly, the Court reaffirms and incorporates by reference its prior FLSA collective action analysis as set forth in its Preliminary Approval Order. (*See id.* at 17–19.)

### 2.    Fairness, Reasonableness, and Adequacy of Proposed FLSA Collective Action Settlements

"If the collective action members are similarly situated, most courts then evaluate the settlement under the standard established by the Eleventh Circuit, which requires the settlement to constitute a fair and reasonable resolution of a bona fide dispute." *Otey*, 2014 WL 1477630, at *3 n.5 (collecting cases) (internal quotation marks and citation omitted). "[T]he factors that courts consider when evaluating a collective action settlement are essentially the same as those that courts consider when evaluating a [class action] settlement" under Rule 23(e). *See id.* at *11 (applying same fairness factors to settlement involving FLSA collective and class action).

As stated above, *see* Sec. I.(D) *supra,* the Court finds that the Rule 23(e)(2) factors weigh in favor of approving the Settlement. (*See also* Doc. No. 181 at 19–28.) Therefore, the sole remaining issue in assessing the FLSA collective action settlement is if there is a bona fide dispute regarding the existence of Defendant BAE's FLSA liability. Here, Defendant BAE disputes whether FLSA Collective Members should be compensated for time spent donning and doffing during meal periods. (Doc. No. 179-4 at ¶ 29.) Plaintiffs calculated that potential liability under the FLSA in this case could result in $102,124 in damages. (*Id.*) Therefore, the FLSA settlement amount of $15,000 represents approximately 14.7% of the potential recovery. (*Id.*) Courts in similar cases have held similar FLSA settlement amounts as reasonable. *See, e.g., Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) (finding a wage and hour class settlement fair

17

where the settlement fund represented between 9% and 27% of the total potential recovery).

### 3.     Conclusion

Based on the foregoing, the Court finds the FLSA Settlement is fair, adequate and reasonable. The Court **GRANTS** final approval of the FLSA Settlement.

### F.     Fairness, Reasonableness, and Adequacy of Proposed PAGA Settlement

As the Settlement resolves Plaintiff's PAGA claims as well, the Court must analyze whether the Settlement fulfils the statutory requirements of PAGA and is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes. *See* Cal. Lab. Code § 2699(s)(2) ("The superior court shall review and approve any settlement of any civil action filed pursuant to this part."); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019) (identifying that district courts apply a "Rule 23-like standard" due to the absence of authority governing the standard for review and approval of PAGA settlements).

### 1.     PAGA Statutory Requirements

As noted in the Court's Preliminary Approval Court, Plaintiffs have satisfied the PAGA statutory requirements. (*See* Doc. No. 181 at 30–32.) First, the PAGA settlement provides for a $100,000 PAGA Penalty and that civil penalties recovered are distributed between "the aggrieved employees" (25%) and the LWDA (75%), Cal. Lab. Code § 2699(i). Additionally, the Court noted that the Settlement Agreement and Notice both clearly state that PAGA Members cannot opt out from settlement of the PAGA Claims. (Doc. No. 181 at 32.) *See also Arias v. Superior Ct.*, 46 Cal. 4th 969, 986 (2009) ("Because an aggrieved employee's action under the Labor Code Private Attorneys General Act of 2004 functions as a substitute for an action brought by the government itself, a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government."); *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) ("Thus, in a lawsuit which asserts a PAGA claims and seeks class certification for labor/wage claims, even class members who

18

opt out of the class would be bound by an adverse PAGA judgment or settlement."). Finally, Plaintiffs confirmed that pursuant to Cal. Lab. Code §2699s(2), they sent the proposed settlement to the LWDA at the same time they filed for approval with the Court. (*See* Doc. No. 181 at 31 (citing Matern Decl. ¶ 60; Doc. No. 179-9).) Accordingly, the Court finds that Plaintiff has complied with PAGA's statutory requirements.

## 2.    Fairness, Adequacy, and Reasonableness of PAGA Allocation

It is important "that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being 'fundamentally fair, reasonable, and adequate' with reference to the public policies underlying the PAGA." *Haralson*, 383 F. Supp. 3d at 971 (quoting *O'Connor*, 201 F. Supp. 3d at 1133). The $100,000 Gross Settlement Amount is to be divided amongst 2,025 PAGA Members who worked a total of 151,951 weeks during the Class Period. (May 1, 2025, Gonzalez Decl. ¶ 14.) The highest PAGA payment to be distributed is approximately $30.44 and the average Individual PAGA Payment is approximately $12.55. (*Id.*) Other courts have approved similar PAGA penalty amounts. *See Perez v. Bodycote Thermal Processing, Inc.*, No.: CV 22-00145 RAO, 2024 WL 4329057, at *8 (C.D. Cal. Aug. 23, 2024) (finding PAGA payments averaging $95.43, "with payments ranging from $3.48 to $366.68" fair, reasonable, and adequate); *North v. Superior Hauling & Fast Transit, Inc.*, No. EDCV 18-2564 JGB (KKx), 2020 WL 12967997, at *4 (C.D. Cal. May 29, 2020) (approving settlement that included PAGA average payout of $21.01).

As such, the Court reaffirms its findings that the $100,000.00 PAGA Penalty is fair, adequate, and reasonable considering it in relation to the Class recovery and to other approved PAGA settlements, and considering neither the LWDA nor any PAGA Members have objected.

## 3.    Conclusion

Based on the foregoing, the Court finds the PAGA Settlement meets PAGA's

statutory requirements and is fair, adequate and reasonable.

### G.    Adequacy of Allocation Plan

"Approval of a plan of allocation of settlement proceeds in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Omnivision*, 559 F. Supp. 2d at 1045 (citation and internal punctuation omitted). "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *Id.* (collecting cases).

Here, the proposed plan of allocation is set forth in the Notice that was mailed to Class Members. *See supra* § II.D (explaining plan of allocation in the Settlement); *see also* Doc. No. 185-8 (Notice). As detailed *supra* § III.C and D.1, the Court has found the allocation plan to equitably treat each Class Member, PAGA Member, and FLSA Collective Member based on his or her individual damages in proportion to those incurred by the rest of the Class.

Accordingly, the Court finds the allocation plan fair, reasonable, and adequate.

### H.    Reasonableness of Settlement Administration Costs

Per the terms of the parties' proposed Settlement and the Preliminary Approval Order, PSA was approved as the Settlement Administrator and is to be paid from the Settlement Fund up to $35,000.00 for actually incurred expenses and costs. (Doc. No. 179-8 at 10 ¶ 32.) PSA provided an itemized invoice with actually incurred costs, as of the date of the declaration, and an estimate of remaining costs. (Doc. No. 185-10; *see also* May 1, 2025, Gonzalez Decl. ¶ 17.) Here, the Settlement Administrator took steps to provide notice and implement the settlement, including:

> (i) preparing, translating, printing, and mailing the Notice of Class Action Settlement ("Notice"); (ii) responding to inquiries from Class Members; (iii) calculating the number of Workweeks each Settlement Class Member worked during the period from October 26, 2017 to June 1, 2024 ("Class Period"), calculating the number of FLSA Workweeks each FLSA Collectives Member worked during the period from January 20, 2019 to June 1, 2024 ("FLSA Period"), and the number of PAGA Workweeks that each PAGA Member

20

worked during the time period from November 16, 2020 to June 1, 2024 ("PAGA Period"); (iv) determining the validity of letters indicating a request to be excluded from the Settlement Class ("Requests for Exclusion"), written objections to the Class Settlement ("Notices of Objection"), and/or any dispute regarding the number of Workweeks submitted by Settlement Class Members; (v) calculating the Net Settlement Amount and the Individual Settlement Payments to Participating Class Members, the Individual FLSA Payments to FLSA Collective Members, and the Individual PAGA Payments to PAGA Members; (vi) calculating and distributing the Individual Settlement Payments, the Individual FLSA Payments, and the Individual PAGA Payments; (vii) issuing the payment to the LWDA, Class Counsel's attorneys' fees and costs, the Class Representative Enhancement Payments, and the employer/employee payroll taxes to the appropriate taxing authorities; and (viii) such other tasks as set forth in the Settlement Agreement or as the Parties mutually agree or as the Court orders.

(May 1, 2025, Gonzalez Decl. ¶ 2.)

"Courts regularly award administrative costs associated with providing notice to the class." *Ali v. Franklin Wireless Corp.*, No. 21-CV-00687-AJB-MSB, 2024 WL 5179910, at *9 (S.D. Cal. Dec. 19, 2024); *see also Diaz v. Solar Turbines, Inc.*, No. 320CV01156WQHKSC, 2022 WL 3161900, at *7 (S.D. Cal. Aug. 8, 2022) (awarding $21,359 in settlement administration costs in a 2,276-member class and PAGA action); *see also Heid v. CyraCom Int'l, Inc*., No. 22-CV-1445-MMA (KSC), 2024 WL 4008650, at *14 (S.D. Cal. Aug. 30, 2024) (awarding $50,000 in settlement administration costs in a 5,002-member class and PAGA action).

Based on the foregoing, the Court concludes the Settlement Administrator's costs are fair and reasonably incurred for the benefit of the Class.

## I. Conclusion

In conclusion, having found the effectuated Notice adequate, the Settlement, FLSA Settlement, PAGA Settlement, and plan of allocation fair, adequate and reasonable, and the Settlement Administrator's costs reasonable, the Court **GRANTS** Plaintiff's motion for final approval, subject to a final accounting of itemized settlement administration costs.

## IV. MOTION FOR ATTORNEYS' FEES, COSTS, AND PLAINTIFFS' SERVICE PAYMENT

Plaintiffs filed the instant motion seeking an award of $2,121,489.29 (33.33% of the Maximum Settlement Fund) for attorneys' fees, reimbursement of $179,769.69 for litigation costs incurred, and an award of $20,000.00 for each Class Representative, all to be paid from the Maximum Settlement Fund. (Doc. No. 186-1 at 9–10.) Defendant has not filed an opposition, and no Class Members have objected. For the reasons set forth below, the Court **GRANTS** Plaintiffs' motion for attorneys' fees, litigation costs, and incentive awards for the Class Representatives.

### A. Legal Standard

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Because the relationship between class counsel and class members turns adversarial at the fee-setting stage, district courts assume a fiduciary role that requires close scrutiny of class counsel's requests for fees and expenses from the common fund." *In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020).

### B. Attorneys' Fees

Plaintiffs' counsel, Matern Law Group, PC (MLG or "Class Counsel") seeks $2,121,489.29 in attorneys' fees pursuant to the Settlement. (Doc. No. 186.)

#### 1. Legal Standard

"In a common fund case, such as this, the district court has the discretion to choose between either the lodestar or the percentage-of-fund methods when calculating fees." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016). "Under the percentage-of-fund method, the district court may award plaintiffs' attorneys a percentage of the common fund, so long as that percentage represents a reasonable fee." *Stanger*, 812 F.3d at 738 (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)). "The benchmark percentage is 25%, but, similar to the lodestar, the benchmark percentage 'can be adjusted upward or downward, depending on the circumstances.'" *In re Apple Inc.*

*Device Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022) (quoting *Kim*, 8 F.4th at 1181). "[I]n assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method," courts in the Ninth Circuit may consider "the extent to which class counsel 'achieved exceptional results for the class,' whether the case was risky for class counsel, whether counsel's performance 'generated benefits beyond the cash settlement fund,' the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002)).

"Whichever method is chosen, courts often employ the other method as a cross-check that the award is reasonable." *In re Apple*, 50 F.4th at 784. "Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Stanger*, 812 F.3d at 739 (quoting *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1007 (9th Cir. 2002)).

## 2. Percentage-of-Fund Analysis

Considering the circumstances of this case under the percentage-of-fund analysis, the Court finds Counsel's departure from the 25% benchmark to 33.33% reasonable.

First, "[t]he overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision*, 559 F. Supp. 2d at 1046. According to Plaintiffs, Plaintiffs' counsel "undeniably achieved an impressive result on behalf of the Class" where the $6,364,467.87 Settlement Fund includes $4,500,000 of new funds plus a credit for $1,502,955.87 paid by Defendant BAE to Settlement Class Members in individual settlements, and $361,512 paid by Defendant BAE to Settlement Class Members in March 2023 for underpaid meal and rest period premiums. (Doc. No. 186-1 at 19.) These pay-outs represent approximately 9.1% of the maximum potential value of the class claims, and approximately 17.5% of the value of the discounted class claims. (*Id.* (citing Doc. No. 179-1 at 22:26-23:8)) The highest gross Individual Class Payment is

23

$9,919.61, while the average gross Individual Class payment is $1,721.17 (May 1, 2025, Gonzalez Decl. ¶ 13), which Plaintiffs characterize as "unquestionably exceptional recoveries." (Doc. No. 186-2 at 19–20 (citing *Gentry v. Sup. Ct.,* 42 Cal. 4th 443, 557 (2007) ("[I]ndividual awards in wage-and-hour cases tend to be modest."))).) Furthermore, Plaintiffs identify non-monetary benefits conferred on Class Members following the commencement of litigation, including that BAE began to pay employees for their time undergoing security checks, and BAE started to pay rest and meal break premiums at the regular rate of pay, rather than the base hourly rate. (Doc. No. 186-1 at 20.)

Second, due to the contingency-fee nature of the Plaintiffs' counsel employment, MLG assumed risked in accepting Plaintiffs' case. (MLG Decl. ¶¶ 44–45.) Such representation required Plaintiffs' counsel to bear the burden of all costs and fees for nearly four years of litigation. (*Id.*)

Third, considering awards in similar cases, "[t]he 33.33% award requested in this case is commensurate with percentage-of-the-fund awards made in other wage and hour class actions." *Yanez*, 2022 WL 788703, at *12 (collecting cases); *see also Heid v. CyraCom Intl, Inc.*, No. 22-CV-1445-MMA (KSC), 2024 WL 4008650, at *8 (S.D. Cal. Aug. 30, 2024) ("33% of the Gross Settlement Amount is in line with California courts that routinely award attorneys' fees of one-third of the common fund.")

Finally, to date, no Class Member has objected to the Settlement or to Plaintiffs' attorneys' fee award. (*See* May 1, 2025, Gonzalez Decl. ¶¶ 8–9; *see generally* May 14, 2025, Gonzalez Decl.) An upward deviation from the 25% benchmark is warranted "especially so in light of the fact that not a single class member objected" to Plaintiffs' attorneys' fees. *Singer*, 2010 WL 2196104, at *9.

Based on the forgoing, the Court finds the upward departure from 25% to 33.33% a reasonable award under the percentage-of-fund analysis.

### 3.    Lodestar Cross-Check

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290

F.3d at 1050. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir. 2003)). "Though the lodestar figure is 'presumptively reasonable,' the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment[.]'" *Id.* at 941–42 (quoting first *Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481, 488 (9th Cir. 1988) and then *Hanlon*, 150 F.3d at 1029). However, "adjustments to the lodestar 'are the exception rather than the rule.'" *Stanger*, 812 F.3d at 738 (quoting *Fischel*, 307 F.3d at 1007).

Counsel represents that MLG expended 1,485.5 hours on this case, resulting in a lodestar of approximately $1,188,042.00. (Doc. No. 191 at 3.) MLG's hourly rates range from $1,025 to $1,200 for partners and senior attorneys, $500 to $995 for associates, and $325 for legal assistants. (*See* MLG Decl. ¶¶ 30–39.) In support of the reasonableness of the hourly rates, Counsel provides the year admitted and experience of the attorneys who worked on the case. (*See id.*)

Counsel argues that their rates are "within those years' prevailing hourly rates of attorneys and legal assistants with comparable qualifications, backgrounds, and experience working in employment law in Los Angeles County." (Doc. No. 186-1 at 25; Doc. No. 186-2 ¶ 36.) Plaintiffs also include a declaration from San Francisco-based attorney Michael Rubin ("Rubin Decl."), opining on Plaintiffs' counsel's experience and how MLG's rates are consistent with prevailing rates "in the community," (Doc. No. 186-17 ¶¶ 11–15). However, "as reasonableness is measured by the prevailing rates of the district in which the litigation occurred, the Court narrows its focus to . . . only case[s] . . . in this district." *MATTHEW MOREL, an individual on his own behalf & on behalf of all others similarly situated, Plaintiff, v. HNTB CORPORATION, a Delaware corporation, & DOES*

*1-10, inclusive, Defendants.*, No. 22-CV-00408-AJB-AHG, 2025 WL 1870758, at *12 (S.D. Cal. July 7, 2025) ("*MOREL*"). For this same reason, the Court does not find the Rubin Declaration particularly persuasive because it does not analyze attorneys' hourly rates for wage hour class actions in this district, specifically.

In 2021, this district found "billing rates ranging from $300 to $450 for the paralegals and $680 to $1,005 for the attorneys" to be reasonable in a wage and hour class action where the gross settlement amount was $7,600,000.00. *Amaraut v. Sprint/United Mgmt. Co.*, No. 19-CV-00411-WQH-AHG, 2021 WL 3419232, at *7 (S.D. Cal. Aug. 5, 2021). Here, the hourly rate of three attorneys—Matern, Tauger, and Khalili—exceed those approved by this district in *Amaraut* and run high for rates approved in comparable wages-and-hours litigation in this district. *See Alkady v. First Transit, Inc., No. 16-CV2291-L-BGS*, 2021 WL 2072376, at *6 (S.D. Cal. May 24, 2021) ("The court finds that a partner billing rate of $785 is unreasonably high in this District for wages-and-hours litigation."); *Hose v. Wash. Inventory Serv., Inc.,* No. 14-CV-2869-WQH-AGS, 2020 WL 3606404, at *9 (S.D. Cal. July 2, 2020) (finding attorney hourly rates ranging from $500.00 for a fourth year attorney to $924.00 for a partner with 24 years of experience to be "slightly high" for this district in a wage and hour class action); *but see MOREL* at *12 (finding rates ranging from $1,200 to $1,350 "high for this district" but nevertheless reasonable given the requested amount of fees represented a negative multiplier of approximately .31).

Here, the Court notes that *Amaraut*, *Alkady*, and *Hose* were decided 4–5 years ago. Given that the hourly rates of three of MLG's attorneys exceed the approved rates in *Amaraut,* but not the higher approved rates in *MOREL*, the Court finds that MLG's rates are slightly high but reasonable for the district.

Plaintiffs also advocate to apply a positive 1.79 multiplier to Plaintiffs' original Lodestar amount. (MLG Decl. ¶ 44; *see also* Doc. No. 191 at 2–3.)[7] "The district court . .

---

[7]    Prior to the July 24, 2025, hearing on Plaintiffs' motion for attorneys' fees, Plaintiffs' counsel submitted a declaration amending MLG's lodestar to $1,188,042.00. (*See* Doc. No. 191¶ 5.) With the

. has discretion to adjust the lodestar upward or downward using a multiplier that reflects 'a host of reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *Stetson v. Grissom*, 821 F.3d 1157, 1166–67 (9th Cir. 2016) (quoting *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F3d 935, 941–42 (9th Cir. 2011)). In California wage and hour class action cases, it is not unusual for courts to apply a multiplier ranging from 1 to 4. *See Oliveira v. Language Line Servs., Inc.*, 767 F. Supp. 3d 984, 1007 (N.D. Cal. 2025) (collecting cases where positive multipliers ranging from 1 to 4 were applied in California wage and hour class actions).

Here, as stated previously, Plaintiffs adeptly represented the class, obtained a substantial benefit for the class, and took on risk by nature of the contingency-fee model of this case. *See* Sec. IV. B.2, *supra*. Because courts regularly apply a positive multiplier ranging from 1 to 4 in California wage and hour class actions, *Oliveira*, 767 F. Supp. 3d at 1007, the Court finds the 1.79 multiplier sought by Plaintiffs to be merited.

### 4.    Conclusion

The Court finds Counsel's request for $2,121,489.29 (33.33% of the Maximum Settlement Fund) reasonable under the circumstances, given the records, declarations, and testimony provided by Counsel, and considering the complex nature of a class action lawsuit, the favorable result obtained both monetary and otherwise, the lack of objections, and lodestar cross-check. Accordingly, the Court **GRANTS** the instant motion with regard to Counsel's requested attorneys' fees.

### B.    Costs

Counsel seeks an award of $179,769.69 for litigation costs in prosecuting this action, which is below the $200,000 maximum listed in the Notice and authorized by the Settlement Agreement. (Doc. No. 186-1 at 10.)

---

slightly lower lodestar, the multiplier Plaintiffs seek to apply now equates to approximately 1.7857, which the Court rounds up to 1.79.

"Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *In re Omnivision*, 559 F. Supp. 2d at 1048 (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). "In assessing the reasonableness of the reimbursement request, the Court is 'reminded that it is generally not the practice of an attorney to bill a client for every expense incurred in connection with the litigation in question,' and 'the attorney is expected to absorb some of the cost of doing business as an attorney.'" *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (quoting *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996)).

Here, Counsel seeks reimbursement of *inter alia* the following costs: state filing fees of $1,435, jury fees of $150, service of process fees of $120, court document services of $5,606.71, expert services of $116,495.95, mediation fees of $20,000, and court reporter services of $11,488.91. (MLG Decl. ¶ 53.)

### 1.    Expert Costs

Counsel requests reimbursement for $116,495.95 in expert costs incurred by retaining four experts: Gabriel Anello and Laura Steiner of Employment Research Corporation Expert Services ($98,479.50); Brian Grieser of AppliedSafety and Ergonomics, Inc., a Rimkus Consulting Group company ($14,215.95); and Berger Consulting Group, LLC ($3,800). (*See id.* ¶¶ 21, 53; *see also* Doc. No. 186-11 at 5–6; Doc. No. 191 at 4.)

Counsel retained Employment Research Corporation, including experts Gabriel Anello and Laura Steiner, to conduct a survey of class members and conduct data sampling. (MLG Decl. ¶ 42.) Counsel submitted declarations by Laura R. Steiner and Gabriel Anello in support of Plaintiffs' motion for class certification. (*See* Doc. No. 113-2 at 39–79). In support of Counsel's reimbursement request, Counsel submitted the Employment Research Corporation's engagement letter and invoices, which include the hourly rates of Laura Steiner at $385 for research and $450 for testimony, senior analysts, including Gabriel Anello, at $350 for research and $400 for testimony, and system analysts at $275. (Doc.

No. 186-13 at 43 (engagement letter); *id.* at 42–49 (invoices).) Counsel also submitted a client cost report detailing the expenses. (Doc. No. 186-11 at 5–6.)

Counsel also hired Brian Grieser of AppliedSafety and Ergonomics, Inc. to prepare a report describing a potential time and motion study analysis. (Doc. No. 113-2 at 84.) Counsel submitted a declaration by Brian Grieser and a report from AppliedSafety and Ergonomics, Inc. in support of Plaintiffs' motion for class certification. (*See id.* at 81–98.) In support of Counsel's reimbursement request, Counsel submitted detailed invoices reflecting Brian Grieser's work on this case and his hourly rate of $370. (Doc. No. 186-13 at 4–12.) Counsel also submitted a client cost report detailing the expenses. (Doc. No. 186-11 at 5–6.)

Counsel engaged Berger Consulting Group, LLC to analyze the time and pay data of a sample of putative class members and to prepare a damages model prior to the private mediation with Jeffrey Krivis on December 23, 2022. (Doc. No. 191 at 3.) BCG analyzed the timekeeping data for approximately 198,291 shifts. (*Id.*)

The Court notes that it relied upon Plaintiffs' expert reports in granting certification, (*see* Doc. No. 142), which weighs in favor of reasonableness of the request. *See, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving $41,261.00 for retention of experts as reasonable where the securities class action settled after surviving a motion to dismiss but before class certification briefing). Considering the documentation, case law, and explanation Counsel provided, the Court approves reimbursement of the $116,495.95 for Plaintiffs' experts as reasonable.

### 2. Mediation Fees

Counsel seeks reimbursement of $20,000 in mediation fees: $10,000 for the first mediation on December 23, 2022, and $10,000 for the second mediation on February 16, 2024. (MLG Decl. ¶ 53; Doc. No. 186-11 at 6.) In considering that the second mediation assisted the parties in reaching consensus that eventually led to settlement, the Court finds these mediation expenses reasonable. *See In re Immune Response*, 497 F. Supp. 2d at 1178

(granting reimbursement of mediation expenses as "reasonable and necessary" in resolving protracted litigation); *see also MOREL* at *13 (awarding reasonable mediation fees).

### 3.    Court Reporter Services

Counsel requests reimbursement of $11,488.91 in court reporter services. (MLG Decl. ¶ 53.) In support of the request, Counsel submits the invoices from Network Deposition Services, Inc. and identifies the depositions and status conferences where court reporter costs were incurred. (Doc. No. 186-11 at 2-3.) Because courts routinely reimburse court reporter fees, the Court approves Counsel's request for court reporter services. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-00540-JLS-AGS, 2021 WL 5632673, at *10 (S.D. Cal. Nov. 30, 2021) (approving reimbursement of "miscellaneous costs related to printing and photocopying, postage, transcript fees, mediation fees, court reporter fees, and court/filing fees" as those "typically incurred by counsel in complex litigation" and "routinely charged to clients billed by the hour").

### 4.    Court Document Services & Legal Research Services

Counsel seeks $5,606.71 for "court document services." (MLG Decl. ¶ 53.) In support of the request, Counsel submits the MLG's Client Cost report indicating charges from Veritext regarding transcript and video services, as well as from Nationwide Legal Research regarding subpoenas and Plaintiffs' briefing. (Doc. No. 186-11 at 4–5.) The Court approves $5,606.71 as reasonable expenses for discovery tools and legal research. *See e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving $12,892.40 for online research where class action settled after surviving a motion to dismiss but before class certification briefing); *see also Ali v. Franklin Wireless Corp*., No. 21-CV-00687-AJB-MSB, 2024 WL 5179910, at *14 (S.D. Cal. Dec. 19, 2024) (approving $3,285.64 as reasonable for legal research and document retrieval).

### 5.    Remaining Costs

Counsel's remaining costs are for state filing fees of $1,435, jury fees of $150, and service of process fees of $120. Because these fees are regularly reimbursed, the Court approves these remaining costs. *See, e.g.*, *Heid v. CyraCom Int'l, Inc.*, No. 22-CV-01445-

MMA-KSC, 2024 WL 4008650, at *13 (S.D. Cal. Aug. 30, 2024) (finding reasonable $31,110.36 in fees related to mediation, legal research, service of process, filing, travel, courier and copying); *Scott v. Blackstone Consulting, Inc.*, No. 21-CV-1470-MMA-KSC, 2024 WL 271439, at *11 (S.D. Cal. Jan. 24, 2024) (awarding $15,204.08 filing fees, service fees, photocopying costs, postage, travel, discovery and research related expenses, mediation fees and related travel, and other litigation related expenses); *Yanez*, 2022 WL 788703, at *13 (approving $10,000.00 in "expenses [that] include[d] costs for filing, courier charges, mediation, in house copies, postage, legal research, pacer fees, PAGA filing fees, expert fees, CourtCall, and Vendor Copy Costs").

Having reviewed the itemized billing records and considering the circumstances of the instant action, the Court finds the requested costs were reasonably incurred in litigating this action for the benefit of the Class and are all commonly reimbursed in similar amounts. Based on the briefing, hearing testimony, and documentation provided, the Court **GRANTS** Counsel's request for expenses.

### C.    Class Representative Service Award

Finally, in the instant motion, Plaintiffs seek an award of $20,000 for each Class Representative for a total of $40,000. (Doc. No. 186-1 at 30–33.)

Incentive awards are designed to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). Although "[i]ncentive awards are fairly typical in class action cases," they are discretionary. *Staton*, 327 F.3d at 958. In deciding whether to approve an incentive award, courts consider factors including "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental*, 779 F.3d at 947 (quoting *Staton*, 327 F.3d at 977); *see also Ridgeway v. Wal-Mart Stores Inc.*, 269 F. Supp. 3d 975, 1002 (N.D. Cal. 2017) (listing factors including risk to the representative, notoriety and personal difficulties encountered, amount of time and

31

effort spent, duration of litigation, and personal benefit).

The Court affirms its conclusion in the Preliminary Approval Order, which found that the requested service award of $20,000 for each Class Representative was "fair and reasonable in light of the extraordinary risks they accepted and the time and effort they expended for the benefit of the Class." (Doc. No. 181 at 22.) Specifically, Plaintiff Cabrales has been a plaintiff in this case since October 2021, while Plaintiff Stanislas has been involved since January 2022. They have assisted litigation in this case by responding to discovery requests, participating in depositions and an ENE, reviewing motions and documents, attending mediations, and maintaining regular communication with Class Counsel. (Doc. No. 186-16, Declaration of Tychicus Stanislas, "Stanislas Decl." ¶ 4; Doc. No. 186-15, Declaration of Federico O. Cabrales, "Cabrales Decl." ¶ 4.) Cabrales states he has spent over 100 hours on this case (Cabrales Decl. ¶ 5), while Stanislas has spent approximately 80 hours on this case (Stanislas Decl. ¶ 5). Furthermore, the aggregate amount of the proposed service awards represents less than one percent (1%) of the Maximum Service Amount. (Doc. No. 186-2 at 32–33.)

Moreover, courts in similar cases have held similar service awards to be reasonable. *See Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1299 (S.D. Cal. 2017) (awarding $15,000 for each of 5 plaintiffs, which combined for 0.3% of $25 million settlement); *Coates v. Farmers Grp., Inc*., No. 15-CV-01913-LHK, 2016 WL 5791413, at *2 (N.D. Cal. Sept. 16, 2016) (approving service award of $25,000 to two named plaintiffs); *In re: High-tech Employee Antitrust Litig*., No. 11-CV-2509- LHK, 2014 WL 10520478, at *2 (N.D. Cal. May 16, 2014) (awarding each class representative $20,000 in employee case, amounting to just 0.4 percent of the total recovery).

Accordingly, the Court **GRANTS** Plaintiff's request for an incentive award of $20,000.00 to Federico Cabrales and $20,000 to Tychicus Stanislas.

### D.    Conclusion

Based on the foregoing, the Court **GRANTS** Plaintiff's motion and **AWARDS $2,121,489.29** of the Maximum Settlement Amount for attorneys' fees, **$179,769.69** in

litigation expenses, and **$20,000.00** to each Class Representative, Cabrales and Stanislas, for their service as Class Representatives.

## V.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiffs' motion for final approval (Doc. No. 185) and **GRANTS** Plaintiff's motion for attorneys' fees, costs, and Plaintiffs' service payment (Doc. No. 186).

The Court **APPROVES** the Settlement, and **DIRECTS** the parties to effectuate the Settlement Agreement according to its terms, including inter alia *that:*

- The California Labor & Workforce Development Agency be paid $75,000 as a portion of the total $100,000 PAGA Maximum Settlement Amount;
- $15,000 be divided among FLSA Collective Members on a *pro rata* basis;
- Phoenix Settlement Administrators be paid $35,5000.00 for its services rendered as Settlement Administrator;
- Plaintiffs' Counsel be paid $2,121,489.29 in attorneys' fees and $179,769.00 in reasonable litigation expenses for their work as Class Counsel; and
- Plaintiffs Federico Cabrales and Tychicus Stanislas each be awarded $20,000.00 as compensation for their efforts as Class Representatives.

The Court further **DIRECTS** the Clerk of Court to close the case.

**IT IS SO ORDERED.**

Dated: July 25, 2025

Hon. Anthony J. Battaglia
United States District Judge